**[This opinion has been published in *Ohio Official Reports* at 80 Ohio St.3d 89.]**

THE STATE OF OHIO, APPELLEE AND CROSS-APPELLANT, *v*. SMITH, APPELLANT AND CROSS-APPELLEE.

[Cite as *State v. Smith* (1997), 80 Ohio St.3d 89.]

Criminal law—Aggravated murder—Death penalty—Appeals—Amendments to Section 2(B)(2)(c) and Section 3(B)(2), Article IV, Ohio Constitution and R.C. 2953.02 are constitutional—All cases in which sentence of death has been imposed for an offense committed on or after January 1, 1995 shall be directly appealed from the trial court to the Supreme Court of Ohio.

1.  The amendments to Section 2(B)(2)(c) and Section 3(B)(2), Article IV, Ohio Constitution, and the implementing statute, R.C. 2953.02, are constitutional.

2.  The courts of appeals shall not accept jurisdiction of any case in which the sentence of death has been imposed for an offense committed on or after January 1, 1995.  Appeals in such cases shall be made directly from the trial court to the Supreme Court of Ohio.

(Nos. 96-677 and 96-678— Submitted March 5, 1997—Decided October 15, 1997.)

APPEAL and CROSS-APPEAL from the Common Pleas Court of Butler County, No. CR 95-05-0471.

APPEAL from the Court of Appeals for Butler County, No. CA96-02-024.

————————————

{¶ 1} On May 12, 1995, sometime around 11:00 p.m., defendant-appellant, Kenneth W. Smith ("defendant"), and his brother, Randy Smith ("Randy"), brutally murdered Lewis Ray and Ruth Ray in their Hamilton, Ohio home.  Lewis was severely beaten, his skull was fractured, and his throat was slit, severing his windpipe and carotid arteries.  Ruth died from manual strangulation.  Their home

was ransacked, and money and jewelry were taken. The following morning, David L. Lester, Ruth's son, discovered the bodies of his mother and stepfather and called the police.

{¶ 2} In the Rays' home, police observed signs of a struggle, blood on the kitchen floor, and bloody footprints throughout the house. Police found a damaged white ceramic coffee pot covered with blood stains in the trash can and a green army camouflage hat on the floor. A knife had recently been removed from a butcher block set. Police found Lewis lying on the kitchen floor and Ruth lying in the doorway between the hall and bedroom. The Rays' bedroom had been ransacked, and the contents of dressers were strewn about the floor.

{¶ 3} Earlier in the evening of May 12, 1995, defendant and Randy had gone to the Crystal Lounge, a.k.a. Crystal Bar, with a friend, Russell C. Baker. At approximately 10:20 p.m., defendant borrowed Baker's car allegedly to pick up his wife, Brenda Smith, and some friends. By midnight, defendant had not returned Russell's car. At about that time, Brenda and Lillian Canafax, Randy's live-in girlfriend, arrived at the Crystal Lounge also looking for the Smith brothers. About forty-five minutes later, Russell and the two women decided to go to Chasteens Bar. Defendant eventually showed up at Chasteens Bar at approximately 1:30 a.m. When Russell questioned defendant about the car, defendant claimed that he was late because he had been in a fight at a gas station. Defendant showed Russell a bump on his head. At the time, Russell also noticed that defendant had changed his clothes.

{¶ 4} At approximately 2:00 a.m., defendant left Chasteens Bar in his Monte Carlo automobile with Brenda, Randy, Lillian, and Russell. Defendant drove to his house, handed his car keys to Randy, and instructed Randy to take a stuffed pillowcase from a nearby blue automobile and put it into the trunk of the Monte Carlo. Russell accused the Smith brothers of being "out thieving with my car." Defendant replied, "Russell, I wouldn't do that." The group then drove to

Buckeye Street, where Russell's brother, James, was staying. Russell soon went home and to bed.

{¶ 5} In the early hours of May 13, 1995, defendant admitted to his friend, James Baker, that he had killed Lewis Ray and that his brother, Randy, had strangled Ruth Ray. James testified that on May 12, 1995, he was staying at his mother's apartment, when defendant and Randy arrived at approximately 1:30 a.m. in Russell's automobile. The Smiths had been to the apartment earlier in the evening before going to the Crystal Lounge. Defendant told James that he had been in a fight, and James noticed that defendant had cleaned up and changed clothes. Defendant was wearing a sweater and boots instead of tennis shoes. He was not wearing a hat. James further testified that defendant left the apartment again at 1:35 a.m. to go to Chasteens Bar.

{¶ 6} When defendant returned to James's mother's apartment at approximately 2:45 a.m., he began to tell James about the murders. James testified that defendant told him that he had taken a hammer and "struck Louie Ray between his eye[s]," and that during this time, defendant had winked at his brother, Randy, who followed Ruth into a bedroom and strangled her. Defendant also told James that they took gold and jewelry in a pillowcase from the Rays' home.

{¶ 7} James testified that when he asked defendant why he killed the Rays, defendant replied that they had killed them to prevent the Rays from identifying them. James testified that defendant "was talking how he sliced Lewis Ray's throat from ear to ear and just laughing about it." Defendant also told James that after he killed Lewis, he "kicked Ruth's brain in" to make sure she was dead. James testified that defendant brought a pillowcase stuffed with jewelry inside the apartment, but James asked him to take it back to the car.

{¶ 8} Later that morning, James was driving around with defendant and Brenda. They stopped to buy cigarettes and marijuana. Defendant mentioned to James that he was concerned because he lost his green army camouflage hat in the

struggle with Lewis. Eventually they drove to Russell's home. There, out of defendant's presence, James told Russell what defendant had admitted. Defendant then suggested to James that he hide the remaining jewelry. This prompted Russell to contact the police. Police later recovered the jewelry in the attic of a garage.

{¶ 9} In addition to the testimony of James Baker, Lillian Canafax testified that she was outside Chasteens Bar arguing with Randy when he showed her a gun. She testified that she saw the same gun in her bedroom the following morning. Several days later, after she found the gun and money under the bed, she authorized police to search the apartment. Lillian also turned over to police three money orders she had purchased for Randy the day after these crimes occurred.

{¶ 10} Another witness testified that around 11:15 or 11:30 p.m., he saw Randy standing outside a pizza parlor about a block from the Rays' residence. The witness testified that Randy had a hammer in his hand as he ducked behind the building. Russell testified that a hammer was missing from his car after he had loaned his car to defendant.

{¶ 11} That afternoon, the police detained defendant for questioning. At the time, police observed cuts and scratches on defendant's face, and a long cut and bruises near his right collarbone. Police also searched Brenda's purse and discovered a cellophane bag containing rings, two $100 bills, and a quantity of nonsequentially numbered food stamps. Police knew that Lewis sold similar jewelry and suspected that he may have dealt in food stamps as currency.

{¶ 12} At the police station, defendant waived his *Miranda* rights and admitted that he and Randy had killed Lewis and Ruth. Defendant said that while at the Crystal Bar, he and Randy had talked about going to rob the Rays, and decided that they would have to kill the Rays because they did not want the Rays to be able to identify them. Defendant told police that after arriving at the Rays' house, he and Lewis began to argue about money that defendant supposedly owed Lewis. Defendant further admitted that he picked up an object from the kitchen

4

counter and struck Lewis, eventually overpowering him. Defendant claimed that Lewis said, "I'm going to kill you, Kenny," so defendant grabbed a knife and cut Lewis's throat. He then rolled Lewis on his side and took his wallet. Defendant said he walked to the bedroom and saw Ruth's body on the floor. Randy had choked her to death. The two men ransacked the bedroom and left in Russell's automobile.

{¶ 13} Police apprehended Randy Smith. They found $344 in bloodstained currency on him. Randy initially denied any knowledge of the murders. Police allowed Randy to speak with his brother, who said, "They got us brother, everybody is telling on us, tell the truth, that's what I did." Randy then explained to the police his involvement in the crimes.

{¶ 14} Later, after again being advised of his *Miranda* rights, defendant gave the police a written confession. In his statement, defendant said that while playing pool at the Crystal Lounge, he talked with Randy about robbing Lewis. He borrowed Russell's car and drove to a pool hall about half a block from the Ray home. Defendant stated that he and his brother walked to the Rays' house. Lewis invited the Smiths into his home. Defendant and Lewis began to argue about $2,500 that defendant owed Lewis. The men began to fight in the kitchen and defendant grabbed something from the counter and struck Lewis's head. They continued to wrestle on the floor. Defendant knew he was going to have to kill Lewis to keep him from telling anyone what happened. Defendant then grabbed a knife and "sliced Louie across the throat."

{¶ 15} In his written confession, defendant further admitted that he took Lewis's wallet, then walked into the bedroom. Ruth was lying on the floor in the doorway, and defendant had to step over her body. Defendant said he asked Randy what had happened, and Randy said he had choked Ruth. Defendant further admitted that he then ransacked the bedroom, taking rings, watches, and necklaces, and placed the items in a plastic bag and left.

**{¶ 16}** According to his signed confession, defendant went home after the murders to shower and change clothes. He and Randy divided the money found in Lewis's wallet. Defendant's share was around $625. Defendant then put his bloody clothes, the knife, and Lewis's wallet into a green trash bag that Randy later threw into the river. The two men then drove to Chasteens Bar.

**{¶ 17}** In his confession, defendant explained that after leaving Chasteens Bar, he drove to the apartment where James Baker was staying and began to go through the jewelry that the defendant and Randy had taken from the Rays' house. Defendant picked out some items he wanted to keep. The following morning he placed some rings into a plastic bag and gave them to Brenda, who put them into her purse. Defendant put the remainder of the jewelry into the trunk of his Monte Carlo. He and James then put the jewelry into the attic of James's grandmother's garage. During police questioning, defendant also admitted that the wristwatch he was wearing had belonged to Lewis.

**{¶ 18}** At trial, defendant testified that he and Randy went to the Rays, intending only to steal saws and drills from the yard. They parked the car away from the house, but as they walked into the yard, Lewis opened the gate and saw them. Lewis invited them into the house, and the men began to argue about money that defendant allegedly owed Lewis. Defendant testified that within ten minutes, "everything got real violent." Lewis "jumped up," told defendant he "was going to shoot" him, and hit defendant "upside the head with something." Defendant testified that he grabbed something from near the stove and struck Lewis. Defendant testified that Lewis tried to push him down the basement steps. Defendant then grabbed a knife and cut Lewis as he approached. Defendant bent down, turned Lewis on his side, and grabbed his wallet. Defendant further testified that Randy told him that he had choked Ruth. The brothers then ransacked the bedroom, taking jewelry.

**{¶ 19}** Defendant denied that he intended to kill the Rays. Defendant

claimed that Lewis was his best friend, and he "wouldn't cold blooded kill him for nothing." Defendant testified that he was very upset about the Rays because they were "like family" to him. He admitted that he told James about killing Lewis, but testified that he wasn't laughing or joking, but instead, he was "in tears."

{¶ 20} Kenneth Smith was charged in two counts with the aggravated felony-murder of Lewis Ray and Ruth Ray in violation of R.C. 2903.01(B). Each murder charge contained three death specifications: the offense was committed to escape detection, apprehension, trial, or punishment for other offenses, R.C. 2929.04(A)(3); the offense was part of a course of conduct involving the purposeful killing of two or more persons, R.C. 2929.04(A)(5); and the offense was committed during the course of an aggravated robbery, R.C. 2929.04(A)(7). He was also charged with two counts of aggravated robbery that included the allegation of a prior felony conviction for attempted burglary. The jury convicted defendant as charged and recommended the death penalty on the aggravated murder counts. The trial court sentenced defendant to death.

{¶ 21} In case No. 96-677, defendant directly appeals his convictions and sentence from the trial court to this court, and the state cross-appeals on an issue related to the merger of the murder specifications. Defendant attempted to appeal to the court of appeals, but his appeal was dismissed because the appellate court stated that it lacked jurisdiction over death penalty appeals under the Ohio Constitution as amended in 1994. In case No. 96-678, defendant appeals the court of appeals' dismissal. Upon motion, this court consolidated the cases.

_____

*Betty D. Montgomery*, Attorney General, and *Michael L. Collyer*, Assistant Attorney General; *John F. Holcomb*, Butler County Prosecuting Attorney, *Daniel G. Eichel* and *John M. Holcomb*, Assistant Prosecuting Attorneys, for appellee and cross-appellant.

*David H. Bodiker*, Ohio Public Defender, *Kathleen A. McGarry* and

*Stephen A. Ferrell*, Assistant State Public Defenders, for appellant and cross-appellee.

*Joseph T. Deters* and *William E. Breyer*, urging affirmance for *amicus curiae*, Ohio Prosecuting Attorneys Association.

*W. Andrew Hasselbach*, urging reversal for *amicus curiae*, Ohio Association of Criminal Defense Lawyers.

*J. Dean Carro*, urging reversal for *amicus curiae*, Law Professors' *Amicus Curiae* Brief Committee.

_____

**LUNDBERG STRATTON, J.**

{¶ 22} In these appeals, Kenneth Smith challenges the constitutionality of the 1994 amendments to the Ohio Constitution that provide for the direct appeal of capital cases from common pleas courts to the Supreme Court of Ohio.  Defendant also raises nineteen propositions of law for review.  For the reasons that follow, we hold that Ohio's appellate process for capital cases does not violate the Equal Protection Clause or the Due Process Clause of the United States Constitution.  Upon review of each proposition of law, we find none warrants reversal of defendant's convictions or death sentence.  Pursuant to R.C. 2929.05(A), we have independently weighed the aggravating circumstances against the mitigating factors, and compared the sentence to those imposed in similar cases for both counts of aggravated murder.  Accordingly, we affirm his convictions and uphold the sentences of death.

I

CONSTITUTIONALITY OF DIRECT REVIEW

{¶ 23} On November 8, 1994, Ohio voters approved Issue I, which amended Section 2(B)(2)(c), Article IV of the Ohio Constitution to provide for direct appeal to this court "as a matter of right in cases in which the death penalty has been imposed."  Concurrently, Section 3(B)(2), Article IV of the Ohio

Constitution was amended to eliminate any jurisdiction of the courts of appeals "to review on direct appeal a judgment that imposes a sentence of death." The General Assembly enacted implementing statutory changes, *e.g.*, amendment to R.C. 2953.02 by 1995 Am.Sub.H.B. No. 4. These changes applied only to offenses committed on or after January 1, 1995. Sub.H. Joint Resolution No. 15, Schedule, 145 Ohio Laws, Part IV, 7811, 7814; see, also, Baldwin's Ohio Revised Code, Section 2, Article IV, Ohio Constitution, 1994 Editor's Comment. Defendant's convictions and sentences are the first case to be considered by this court under the 1994 amendments to the Ohio Constitution. Accordingly, the first issue before this court is whether the constitutional amendments to the Ohio Constitution allowing for the direct appeal of capital cases from the trial court to the Supreme Court of Ohio pass constitutional muster. After thoroughly reviewing this issue, we conclude that they do.

{¶ 24} In 1802, Ohio's first Constitution established a system of appellate review. Sections 2 and 4, Article III, 1802 Ohio Constitution. The 1851 Constitution limited the Supreme Court's original jurisdiction and introduced intermediate appellate courts. In 1968, with the Modern Courts Amendment, Ohio established a two-tier system of review for capital cases. See Baldwin's Ohio Revised Code, Section 2, Article IV, Ohio Constitution, 1990 Editor's Comment. When Ohio revised its death penalty statute in 1981 pursuant to the United States Supreme Court ruling in *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, the two-tiered system was retained.

{¶ 25} However, the general public, both in Ohio and across the nation, has been increasingly dissatisfied with inordinate delays that pervade the death penalty system. Since the enactment of Ohio's present death penalty statute in 1981, following *Gregg*, as of July 1997, over one hundred seventy people have been sentenced to death. None of these is yet close to execution. Ohio's last execution was carried out in 1963. The public's frustration is clearly understandable.

**{¶ 26}** The Supreme Court of Ohio recognized the public's frustration in *State v. Steffen* (1994), 70 Ohio St.3d 399, 639 N.E.2d 66, when the court ruled that lower courts could not stay an execution date set by the Supreme Court of Ohio. Justice Moyer's pronouncement at that time bears repeating:

"The constitutions and courts of our country have established procedural safeguards reflecting our society's concern for the rights of citizens accused of committing crimes. When those safeguards are used to thwart judgments rendered pursuant to the procedures, it is predictable that citizens will lose confidence in the ability of the criminal justice system to enforce the judgments.

* * *

"Whatever one's views regarding capital punishment, the reality is that some thirteen [now sixteen] years ago the General Assembly adopted a death penalty as the public policy of this state. The courts have declared the law to be constitutional; this court has affirmed eighty-seven [now one hundred twenty-five] death penalties, and the law has not yet been fully implemented. That fact creates doubt about the ability of the justice system to carry out the death penalty and, perhaps even more importantly, a perception that the entire criminal justice system is not working. Inaccurate as those perceptions are, they do persist.

"* * *

"In Ohio, many death penalty actions are reaching the point of judicial saturation. As in the cases presently before us, the criminal justice system has more than satisfied the defendant's constitutional rights to due process and fair trials. Their convictions have been viewed and reviewed." *Id*. at 406-407, 639 N.E.2d at 73-74.

**{¶ 27}** Against this backdrop of extraordinary delay and loss of public confidence in the integrity of the death penalty system, the citizens of the state of Ohio have spoken through constitutional amendment. In November 1994, the Ohio citizens passed amendments to the Ohio Constitution allowing for direct appeal of

10

cases from the trial court to the Supreme Court of Ohio. The first of the two amendments establishes a direct right of appeal from the trial court to the Supreme Court of Ohio, and the second amendment removes such right of appeal from the intermediate appellate courts.

{¶ 28} Section 2(B)(2), Article IV, Ohio Constitution now states:

" (2) The supreme court shall have appellate jurisdiction as follows:

"* * *

"(c) *In direct appeals from the courts of common pleas* or other courts of record inferior to the court of appeals *as a matter of right in cases in which the death penalty has been imposed*[.]" (Emphasis added to new material.)

{¶ 29} Section 3(B)(2), Article IV, Ohio Constitution now reads:

"(2) Courts of appeals shall have such jurisdiction as may be provided by law to review and affirm, modify, or reverse judgments or final orders of the courts of record inferior to the court of appeals within the district*, except that courts of appeals shall not have jurisdiction to review on direct appeal a judgment that imposes a sentence of death."* (Emphasis added to new material.)

The amendments became effective January 1, 1995 and applied to all cases in which the crime was committed on or after January 1, 1995. In response to these constitutional amendments, the legislature also amended R.C. 2953.02 to state:

"In a capital case in which a sentence of death is imposed for an offense committed on or after January 1, 1995, the judgment or final order may be appealed from the trial court directly to the supreme court as a matter of right. The supreme court in criminal cases shall not be required to determine as to the weight of the evidence, except that, in cases in which a sentence of death is imposed for an offense committed on or after January 1, 1995, and in which the question of the weight of the evidence to support the judgment has been raised on appeal, the supreme court shall determine as to the weight of the evidence to support the judgment and shall determine as to the weight of the evidence to support the

sentence of death as provided in section 2929.05 of the Revised Code."

{¶ 30} Defendant now challenges the constitutionality of these constitutional and statutory amendments on several bases. Defendant's general attack on the constitutionality of Ohio's death penalty statute is summarily rejected. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264.

*Eighth Amendment Challenges*

{¶ 31} Initially, all parties concede that there is no constitutional right to an appellate review of a criminal sentence. The United States Supreme Court in *Estelle v. Dorrough* (1975), 420 U.S. 534, 536, 95 S.Ct. 1173, 1175, 43 L.Ed.2d 377, 380, held, "[T]here is no federal constitutional right to state appellate review of state criminal convictions." The Supreme Court has stated that "the right of appeal is not essential to due process, provided that due process has already been accorded in the tribunal of first instance." *State ex rel. Bryant v. Akron Metro. Park Dist.* (1930), 281 U.S. 74, 80, 50 S.Ct. 228, 230, 74 L.Ed. 710, 715. The United States Supreme Court laid out the rationale most clearly in *Ross v. Moffitt* (1974), 417 U.S. 600, 610-611, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341, 351:

"The defendant needs an attorney on appeal not as a shield to protect him against being 'haled into court' by the State and stripped of his presumption of innocence, but rather as a sword to upset the prior determination of guilt. This difference is significant for, while no one would agree that the State may simply dispense with the trial stage of proceedings without a criminal defendant's consent, it is clear that the State need not provide any appeal at all."

{¶ 32} However, once the right of appeal is established, "these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts." *Williams v. Oklahoma City* (1969), 395 U.S. 458, 459, 89 S.Ct. 1818, 1819, 23 L.Ed.2d 440, 442; *Rinaldi v. Yeager* (1966), 384 U.S. 305, 310, 86 S.Ct. 1497, 1500, 16 L.Ed.2d 577, 581. Accord *Blackledge v. Perry* (1974),

417 U.S. 21, 25, 94 S.Ct. 2098, 2101, 40 L.Ed.2d 628, 633, fn. 4; *Lindsey v. Normet* (1972), 405 U.S. 56, 77, 92 S.Ct. 862, 876, 31 L.Ed.2d 36, 52-53.

**{¶ 33}** Moreover, "[t]he state has a wide discretion in respect to establishing its systems of courts and distributing their jurisdiction." *Bryant*, 281 U.S. at 81, 50 S.Ct. at 231, 74 L.Ed. at 716. Accord *Missouri v. Lewis* (1880), 101 U.S. 22, 30, 25 L.Ed. 989, 992. The United States Supreme Court has consistently been "unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v. Florida* (1984), 468 U.S. 447, 464, 104 S.Ct. 3154, 3164, 82 L.Ed.2d 340, 355; *Cabana v. Bullock* (1986), 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704. In *Spaziano*, the United States Supreme Court was reviewing a capital sentencing structure in which a judge was permitted to override a jury's recommendation of a life sentence. In finding such a structure constitutional, the court noted that thirty out of thirty-seven jurisdictions with capital sentencing gave that decision to the jury, with only three allowing the judge to overrule a recommendation of a life sentence. *Spaziano,* 468 U.S. at 463, 104 S.Ct. at 3164, 82 L.Ed. 2d at 354. The court stated:

"The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws." *Id*., 468 U.S. at 464, 104 S.Ct. at 3164, 82 L.Ed.2d at 355. In fact, the thirty-eight states that now authorize capital punishment exhibit a wide variety of appellate review procedures in criminal cases. Nine capital-punishment states generally have only a single appellate court with statewide appellate jurisdiction in criminal cases.[1]

---

1. Delaware [Del.Code Ann. 11-4209(g) (1996)]; Mississippi [Miss.Code Ann. 99-19-105 (1996)]; Montana [Mont.Code Ann. 46-18-308 (1995)]; Nevada [Nev.Rev.Stat.Ann. 177.055 (1997), and S.Ct.Rule 250(1997)]; New Hampshire [N.H.Rev.Stat.Ann. 630:5(X)(1996)]; Oklahoma [Okla.Stat.Ann. 21-701.13A (1997), Art.7, Sec.4, Okla. Constitution]; South Dakota [S.D.Codified Laws 23(A)-27A-9(1996)]; Texas [Tex.Crim.Proc.Code Ann. Art. 37.071, Sec. 2(h)(1997)]; and Wyoming [Wyo.Stat. 6-2-103(1996)].

**{¶ 34}** At least twenty-nine capital-punishment states, including Ohio, have a two-tier appellate court system. Of these states, about twenty-five, now including Ohio, require a capital case to be reviewed only in the state supreme court and not in intermediate appellate courts. These states include Arizona, California, Florida, Illinois, Indiana, Kentucky, Maryland, New York, Pennsylvania, and Virginia.[2] In addition, Massachusetts and Minnesota, which do not have capital punishment, nonetheless specify that first-degree murder cases (but not other criminal cases) bypass intermediate courts and go directly to the state supreme court.[3] See, *e.g., Dickerson v. Latessa* (C.A.1, 1989), 872 F.2d 1116 (discussing Massachusetts procedures). Thus, in very few capital punishment states will a case involving a death sentence be reviewed by two appellate courts. See, also, *Bundy v. Wilson* (C.A.1, 1987), 815 F.2d 125, 136-142.

**{¶ 35}** Therefore, having reviewed the United States Supreme Court cases and the protections afforded in other jurisdictions, we find no violation of the Eight Amendment to the United States Constitution.

---

2. Arizona [Ariz.Rev.Stat.Ann. 13-4031 (1996)]; California [Cal. Const.Art.VI, Secs. 11, 12(d)(1997)]; Colorado [Colo.Rev.Stat.Ann. 16-12-101.5, 201 (1996)]; Florida [Fla. Const. Art.V, Sec.3(b)(1)(1997)]; Illinois [Ill. Const.Art.6, Sec.4(b)(1997)]; Indiana [Ind. Const.Art.7,Sec.4 (1997)]; Kansas [Kan.Stat.Ann. 21-4627(1997)]; Kentucky [Ky. Const.Sec. 110(2)(b)(1996)]; Louisiana [La. Const.Art.V, Sec.5(D)(1997), and La.Code Crim.Proc.Art. 912.1(1997)]; Maryland [Md. Cts. & Jud.Proc.Code.Ann.12-307(1996)]; Missouri [Mo. Const.Art.V, Sec.3(1996)]; Nebraska [Neb. Const. Art. 1,Sec.23(1995)]; New Mexico [N.M. Const.Art.VI, Sec. 2(1997)]; New York [N.Y. CLS/CPL 450.70 (1996)]; North Carolina [N.C.Gen.Stat.7A-27(a)(1995)]; Ohio [Ohio R.C. 2953.02 (1997)]; Oregon [Ore.Rev.Stat. 163.150(1)(g)(1996)]; Pennsylvania [42 Pa.Cons.Stats. 722 (1997)]; South Carolina [S.C.Code.Ann. 18-9-20; 16-3-25(F) (1996)]; Utah [Utah Code Ann. 78-2-2(3)(i)(1996)]; Virginia [Va.Code.Ann. 17-110.1(1997)]; Washington [Wash.Rev.Code 10.95.100, 2.06.030 (1997)]. Also in Idaho, Arkansas, and Connecticut, but in those states, some cases filed in the Supreme Court can be transferred to intermediate courts. See Idaho [Idaho Code 1-2406 (1997), Idaho App.R.11(1997)]; Arkansas [Ark.Sup.Ct. & Ct.App.Rule 1-2(a)2 (1997)]; and Connecticut [Conn.Gen.Stat.Ann. 51-199(b)(3)(1997)].

3. Mass.Gen.Laws Ann., Chapter 278, Section 33E (1997); Minn. Const.Art.6, Sec.2 (1997), and Minn.Stat.Ann. Sec.632.14 (1997).

*Equal Protection*

**{¶ 36}** Defendant argues that the one-tier system violates the Equal Protection Clause of the United States Constitution, or at the very least, the one-tier system violates equal protection when other defendants are afforded a two-tier appellate review process. First, we start with the proposition that amendments to a state constitution and statutes, when tested against a higher authority, are entitled to a strong presumption of legitimacy. Before a legislative enactment may be declared unconstitutional, "it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus. Accord *State v. Thompkins* (1996), 75 Ohio St.3d 558, 560, 664 N.E.2d 926, 928. "Further, doubts regarding the validity of a legislative enactment are to be resolved in favor of the statute." *State v. Gill* (1992), 63 Ohio St.3d 53, 55, 584 N.E.2d 1200, 1201, citing *State ex rel. Swetland v. Kinney* (1982), 69 Ohio St.2d 567, 23 O.O.3d 479, 433 N.E.2d 217.

**{¶ 37}** Defendant argues that the constitutional amendments are unconstitutional because the appellate review process no longer treats similarly situated defendants equally. Defendant claims that someone now convicted of a minor misdemeanor is afforded greater protection than one sentenced to death. However, the reality is that capital and noncapital defendants were not treated similarly even before the amendments at issue took effect. Under the prior system, capital defendants had a guaranteed right to have all issues, capital or noncapital, constitutional or statutory, reviewed by the Supreme Court of Ohio, a right only discretionary with all noncapital defendants. Only two to three percent of all noncapital defendants who seek review by this court even have their cases heard. In 1995, defendants filed five hundred eighty-three felony discretionary appeals and in 1996, six hundred forty-two such appeals, but this court allowed only seventeen such appeals in 1995 and sixteen in 1996. 1995 Ohio Courts Summary

at Appendices A and C; The Supreme Court of Ohio Annual Report 1996 at Appendices A and C. Therefore, a noncapital defendant rarely can hope for Supreme Court review and has a *right* to only one appeal of all issues.

{¶ 38} On the other hand, under the amendments, a capital defendant also has one right to appeal of *all* issues, but *all* of the capital defendant's noncapital convictions are still reviewed by the Supreme Court of Ohio, along with his or her capital convictions, thereby affording him or her a broader right of review than that afforded to noncapital defendants. Capital defendants also had and still have numerous additional rights, such as appointment of two counsel if indigent.

{¶ 39} In addition, defendants sentenced to imprisonment are usually already serving their terms and have a great interest in expediting their appeals. Capital defendants, on the other hand, while seeking to overturn their convictions, also seek to prolong the appeal process as long as possible, using every conceivable avenue of attack, and the statistics show they have been extremely successful in Ohio.

{¶ 40} As a result, lengthy delays have arisen in enforcing death penalty sentences in Ohio. See *Steffen*. Under these circumstances, Ohio voters had a rational basis to decide that the Supreme Court of Ohio would—in a single appeal as of right—directly review capital cases for crimes committed on or after January 1, 1995.

{¶ 41} Indeed, as defendant points out, the state has taken other steps to expedite the resolution of criminal cases, including capital cases, such as limiting the time within which to file postconviction petitions. See R.C. 2953.21, as amended by 1995 Am.Sub.S.B. No. 4. The United States Supreme Court has also recognized the problem of excessive delays in capital cases. See *Steffen*, 70 Ohio St.3d at 411, 639 N.E.2d at 76. But governments are not restricted to a single method of resolving a pervasive problem; here, the "erosion of the finality of judgments in criminal cases undermines the deterrent effect of criminal law." *Id.*

**{¶ 42}** The distinction drawn between appeal rights in capital and noncapital cases must bear " 'some relevance to the purpose for which the classification is made.' " See *Estelle*, 420 U.S. at 539, 95 S.Ct. at 1176, 43 L.Ed.2d at 382. The state has a direct, legitimate and compelling interest in ensuring that the final judgments of its courts are expeditiously enforced. "When those [procedural] safeguards are used to thwart judgments * * *, citizens will also lose confidence in the ability of the criminal justice system to enforce its judgments." *Steffen*, 70 Ohio St.3d at 406, 639 N.E.2d at 73.

**{¶ 43}** Defendant also claims that equal protection is violated because defendants charged with crimes committed on or after January 1, 1995 are not treated the same as preamendment defendants who still have a two-tier system of review, even though they are similarly situated. However, to adopt defendant's position would be to freeze law in time and to never allow amendments to the criminal justice system. Ohio's death penalty statutes, enacted in 1981, treated all criminals committing murders after enactment differently from defendants committing murders before enactment. See *Dobbert v. Florida* (1977), 432 U.S. 282, 301, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344, 361 (Defendant sentenced to death in case tried after the effective date of remedial statutes amending Florida's capital sentencing procedure in the wake of *Furman v. Georgia* [1972], 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, was not similarly situated to those tried before the statute's effective date, whose death sentences had been commuted to life imprisonment — hence no equal protection violation.). The Equal Protection Clause does not forbid statutes to have a beginning. *Williams v. Walsh* (1912), 222 U.S. 415, 32 S.Ct. 137, 56 L.Ed. 253; *Sperry & Hutchinson Co. v. Rhodes* (1911), 220 U.S. 502, 31 S.Ct. 490, 55 L.Ed. 561. For such a reason, the constitutional amendments apply only to crimes committed on or after the effective date, January 1, 1995, thereby avoiding ex-post-facto complications. Therefore, we find that defendant's position is without merit.

**{¶ 44}** Other jurisdictions have rejected the arguments made by defendant. The Virginia Supreme Court specifically rejected an equal protection challenge to a single appeal to that state's highest court. In *Payne v. Commonwealth* (1987), 233 Va. 460, 474, 357 S.E.2d 500, 508-509, the court held, "It was rational for the General Assembly, given the gravity of cases involving a sentence to death, to provide those defendants an automatic, plenary review in the Commonwealth's highest court."

**{¶ 45}** The Arizona Supreme Court also upheld the constitutionality of a death penalty procedure almost identical to Ohio's against an equal protection challenge. In *State v. Ramirez* (1994), 178 Ariz. 116, 871 P.2d 237, the Arizona Supreme Court rejected a challenge that the statute was unconstitutional because it limited capital defendants to one direct appeal as of right to the Supreme Court, whereas noncapital defendants had two possibilities for appeal—direct appeal to the court of appeals and discretionary review by the Supreme Court. In rejecting an equal protection challenge, the Arizona Supreme Court relied on *Proffitt v. Florida* (1976), 428 U.S. 242, 259-260, 96 S.Ct. 2960, 2970, 49 L.Ed.2d 913, 927, in which the United States Supreme Court reviewed Florida's capital sentencing procedures, which were similar to Arizona's.

**{¶ 46}** In fact, defendant fails to cite *any* case holding that the Equal Protection Clause of the United States Constitution requires two levels of state appellate review in capital cases.

*Due Process*

**{¶ 47}** Additionally, a single-tier system does not violate the capital defendant's right to due process. A direct appeal to this court affords a capital defendant significant advantages in comparison with other criminal defendants. As stated, all of a defendant's issues, both noncapital and capital, constitutional or statutory, are reviewed by the Supreme Court. A court of appeals must apply this court's existing precedents, but this court can directly reverse its own precedents.

A defendant can still directly challenge existing precedent and seek change. Indeed, his or her opportunities are better, as a lower court could not reexamine precedent from the Supreme Court.

{¶ 48} Further, this court can more readily judge both the appropriateness and proportionality of death sentences on a statewide basis, instead of the geographical limits of an appellate district. See, also, *Payne*, 233 Va. at 474, 357 S.E.2d at 508. An appellate court does not have the breadth and scope of experience that this court has to review the death sentences of all eighty-eight counties and to measure the appropriateness and proportionality of all cases in the state.

{¶ 49} Defendant also argues that due process is denied the capital defendant because the Supreme Court of Ohio cannot consider weight-of-the-evidence arguments during the guilt phase (although defendants often argue that the Supreme Court *does* have jurisdiction to do so). Despite some admittedly conflicting case law on this issue, there is *no provision* in the Ohio Constitution or statutes that prevents this court from reviewing weight of the evidence in capital cases. See Article IV of the Ohio Constitution.[4] Further, this court, in its prior review of capital cases, has often responded to claims concerning evidence. For example, in *State v. Greer* (1988), 39 Ohio St.3d 236, 237-240, 530 N.E.2d 382, 388-389, this court devoted two pages of the opinion to reviewing an argument on weight of the evidence. See, also, *State v. Montgomery* (1991), 61 Ohio St.3d 410,

---

4. This court has held that it is not required to review weight-of-the-evidence claims. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 33, 553 N.E.2d 576, 589; *State v. Eley* (1978), 56 Ohio St.2d 169, 172, 10 O.O.3d 340, 341-342, 383 N.E.2d 132, 134; *State v. Robinson* (1955), 162 Ohio St. 486, 487, 55 O.O. 388, 124 N.E.2d 148, 149. We have even gone so far as to say that we are not forbidden to review weight-of-the-evidence claims. See *State v. Frohner* (1948), 150 Ohio St. 53, 75-76, 37 O.O. 406, 415, 80 N.E.2d 868, 880. However, we have also held that we may not review weight-of-the-evidence claims. See *State v. Shoemaker* (1996), 74 Ohio St.3d 664, 664-665, 660 N.E.2d 1197, 1198-1199; *State v. Eley* (1996), 77 Ohio St.3d 174, 180, 672 N.E.2d 640, 648; *State v. Waddy* (1992), 63 Ohio St.3d 424, 432, 588 N.E.2d 819, 827; *State v. Jenks* (1991), 61 Ohio St.3d 259, 263, 574 N.E.2d 492, 496; *State v. Powell* (1990), 49 Ohio St.3d 255, 260, 552 N.E.2d 191, 197; *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 905-906. Those issues are now mooted by the passage of the Issue I amendments to the Ohio Constitution.

416, 575 N.E.2d 167, 173; *State v. Wickline* (1990), 50 Ohio St.3d 114, 123-124, 552 N.E.2d 913, 922-923. In fact, R.C. 2953.02 and 2929.05, even before the adoption of Issue I, required this court to "review and independently weigh" the evidence as to any death penalty sentence. This court has regularly done so without objection from defendants as to its lack of constitutional power to do so. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 199, 203, 15 OBR 311, 341, 345, 473 N.E.2d 264, 296, 299; *State v. Claytor* (1991), 61 Ohio St.3d 234, 244, 574 N.E.2d 472, 481.

{¶ 50} However, the Supreme Court of Ohio has always had the constitutional grant of "appellate jurisdiction" in capital cases. (Preamendment Section 2[B][2], Article IV.) The phrase "appellate jurisdiction" means the power to hear and resolve all issues necessary to determine an appeal, including weight-of-the-evidence claims. On direct appeals, this court now assumes *all* roles performed by the lower appellate courts, including a full weight-of-the-evidence review. The legislature has not expanded this court's jurisdiction by the amendment of R.C. 2953.02, but has merely spelled out the new role of the Supreme Court as the only court of appellate review in death penalty cases.

{¶ 51} Nor is there any requirement in the Constitution, including the amendments, that this court must be unanimous (as a court of appeals must be) on decisions to overturn on a weight-of-the-evidence finding (nor, certainly, would defendant seek such a strict standard). Supreme Court review thus provides greater protection for a capital defendant, since we can reverse on weight of the evidence with a mere majority.

{¶ 52} Defendant also claims that the appellate courts perform a more thorough review than the Supreme Court, citing *Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568:

"When issues of law in capital cases have been considered and decided by this court and are raised anew in a subsequent capital case, it is proper to summarily

20

dispose of such issues in the subsequent case." *Id*., syllabus.

{¶ 53} However, defendant misconstrues *Poindexter*. Nowhere does the court imply that it will not continue to thoroughly consider and review *all* issues. Indeed, we do review all issues. We merely do not need to discuss and address, in opinion form, settled issues of law but may deal with them in summary fashion. "[W]e are not required to consume limited judicial resources writing opinions which analyze time-worn legal arguments raised in a multiplicity of printed pages." *State v. Spisak* (1988), 36 Ohio St.3d 80, 82, 521 N.E.2d 800, 801-802.

*Appellate Review of Noncapital Charges*

{¶ 54} Defendant also appeals the dismissal by the court of appeals of his noncapital charges, arguing that only the capital charges can go directly to the Supreme Court of Ohio. However, the plain language of the amendments speaks of "*cases* in which the death penalty has been imposed" and "*judgment* that imposes the sentence of death." (Emphasis added.) Section 2(B)(2)(c), Article IV and Section 3(B)(2), Article IV, Ohio Constitution. Thus the Supreme Court has jurisdiction over the whole case, instead of counts, charges, or sentences.

{¶ 55} However, "courts must interpret the Constitution broadly in order to accomplish the manifest purpose of an amendment [to the Constitution]." *Swetland,* 69 Ohio St.2d at 570, 23 O.O.3d at 481, 433 N.E.2d at 220. "In the interpretation of an amendment to the Constitution, the object of the people in adopting it should be given effect * * *." *Castleberry v. Evatt* (1946), 147 Ohio St. 30, 33 O.O. 197, 67 N.E.2d 861, paragraph one of the syllabus. Indeed, to so separate the convictions and appeals would lead to further delay, confusion in record transmittal, waste of judicial resources, possible inconsistency in decisions, and a further wait for the appeal to the Supreme Court from the appellate court on noncapital cases (albeit now only a two to three percent chance of being accepted instead of the current certainty of review). Such absurd consequences were surely never intended by the voters in passing such amendments and would thwart the very purpose of

expeditious review of capital cases.

{¶ 56} In conclusion, we have determined that the amendments to the Ohio Constitution, Section 2(B)(2) and Section 3(B)(2), Article IV, and the implementing statute, R.C. 2953.02, are constitutional. Therefore, the courts of appeals shall not accept jurisdiction of any cases in which the sentence of death has been imposed for an offense committed on or after January 1, 1995. Appeals in such cases shall be made directly from the trial court to the Supreme Court of Ohio.

II

TRIAL ISSUES

{¶ 57} We now address defendant's propositions of law that pertain to the pretrial and trial.

*Voir Dire and Jury Selection*

{¶ 58} In Proposition of Law XII, defendant contends that the trial judge erred by not allowing for "complete and thorough questioning in voir dire." However, defendant does not specify what, if any, questions the court did not permit. A review of the transcript shows that the court placed few restrictions on defense counsel's questioning of the potential venire. Furthermore, the court's decision to question the entire jury panel and not sequester individual jurors "is a matter of discretion within the province of the trial judge." *State v. Mapes* (1985), 19 Ohio St.3d 108, 19 OBR 318, 484 N.E.2d 140, paragraph three of the syllabus.

{¶ 59} It was within the discretion of the trial court to use its own jury questionnaire instead of the questionnaire submitted by the defense. The court allowed counsel an opportunity to modify by agreement the court's proposed questionnaire. *State v. Carter* (1995), 72 Ohio St.3d 545, 555, 651 N.E.2d 965, 975; *State v. Loza* (1994), 71 Ohio St.3d 61, 73, 641 N.E.2d 1082, 1098-1099.

{¶ 60} Defendant further contends that the trial judge should have, *sua sponte*, excused four jurors for cause because each one had a personal experience or acquaintance with a victim or investigator in the case that indicated he or she

22

could not be fair and impartial.  However, neither the defense nor the prosecution objected to these jurors for cause.  Under these circumstances, the trial judge should be very reluctant to intervene.

**{¶ 61}** Whether to disqualify a juror for cause is "a discretionary function of the trial court * * * [not reversible] on appeal absent an abuse of discretion." *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus.  "[T]he trial judge saw and heard" the prospective jurors and could evaluate their responses. *State v. Allen* (1995), 73 Ohio St.3d 626, 629, 653 N.E.2d 675, 681. We find no abuse of discretion.  See *State v. Allard* (1996), 75 Ohio St.3d 482, 493-496, 663 N.E.2d 1277, 1287-1289.  Furthermore, defendant waived any potential error by failing to challenge the prospective jurors at trial. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, vacated on other grounds by 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156.  Accordingly, Proposition of Law XII is without merit.

*Admissibility of Evidence*

A. Defendant's Confession

**{¶ 62}** In Proposition of Law XI, defendant challenges the admission of his written confession on the basis that his initial arrest was illegal.  He claims police had no probable cause and no warrant.  Thus, he claims all evidence obtained as a direct result should be suppressed.  When reviewing a ruling on a motion to suppress, a court must remain mindful that "the weight of the evidence and credibility of witnesses are primarily for the trier of the fact." *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542, 547; *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 437 N.E.2d 583, 584.

**{¶ 63}** The trial court rejected defendant's claim that the police lacked probable cause to detain and arrest him.  The court found that the police had ample cause to arrest defendant based upon information supplied by Russell Baker.  Police learned from Russell that defendant had borrowed his car under suspicious

circumstances, had not come back for a long period of time, and had changed clothes and been in a fight. Russell also disclosed to police that defendant had admitted to James Baker that defendant and Randy had killed the Rays, and Russell disclosed details about the crime scene that only the killer would have known. Based upon the totality of the circumstances, police had specific and articulable facts that warranted defendant's detention and arrest. See *Loza*, 71 Ohio St.3d at 71, 641 N.E.2d at 1097; *State v. Comen* (1990), 50 Ohio St.3d 206, 210, 553 N.E.2d 640, 644.

{¶ 64} Defendant also contends that his confession to police was not voluntary and that he did not knowingly waive his *Miranda* rights because he was under the influence of drugs and alcohol at the time. There was no evidence presented of such influence. Police advised defendant of his *Miranda* rights on more than one occasion. At no time did defendant ask for counsel. The trial court properly found that defendant "was fully advised of his constitutional rights," and he "knowingly, intelligently and voluntarily waived his rights to remain silent and to have the assistance of counsel." We find that the court properly admitted defendant's confession. *Carter*, 72 Ohio St.3d at 551-552, 651 N.E.2d at 972-973; *State v. Brewer* (1990), 48 Ohio St.3d 50, 57-58, 549 N.E.2d 491, 498-499.

{¶ 65} Defendant's argument that his confession should be suppressed because police did not electronically record it is also without merit. Neither the Ohio Constitution nor the United States Constitution requires that police interviews, or any ensuing confessions, be recorded by audio or video machines. See *State v. Rhoades* (1991), 121 Idaho 63, 73, 822 P.2d 960, 970; *People v. Raibon* (Colo.App.1992), 843 P.2d 46, 49; *State v. Buzzell* (Me.1992), 617 A.2d 1016, 1018-1019; *Williams v. State* (Miss.1988), 522 So.2d 201, 208; *State v. Gorton* (1988), 149 Vt. 602, 606, 548 A.2d 419, 422; *State v. Kilmer* (1993), 190 W.Va. 617, 628, 439 S.E.2d 881, 892. But, see, *Stephan v. State* (Alaska 1985), 711 P.2d 1156, 1159-1160 (based on Alaska Constitution). Consequently, we reject

defendant's Proposition of Law XI.

### B. Victims' Character Evidence

{¶ 66} In Proposition of Law XIV, defendant claims the trial court erred in allowing the prosecutor to comment on and to introduce favorable character evidence about the victims while restricting cross-examination regarding bad character. Defendant contends it was improper to allow testimony about the duration of the victims' marriage, their occupations, and the number of their children, and to admit photographs of the victims. However, proving the facts of a murder necessarily involves disclosure of details as to the victims and their lives. "The victims cannot be separated from the crime." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212, 218-219. Accord *Allard*, 75 Ohio St.3d at 499-500, 663 N.E.2d at 1292; *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 438-439, 650 N.E.2d 878, 882.

{¶ 67} Moreover, the record reflects that defendant did not object during the prosecutor's opening statement that foreshadowed this testimony. Neither did he object when David Lester, the victim's son, referred to the personal details regarding the victims, or when the prosecutor offered the victims' photographs into evidence. We need not consider a claim of error that was not raised in any way in the court below. See *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Having failed to object at trial, defendant waived any perceived error except for plain error. Because the references to the victims' background were minimal and relatively innocuous, we find they did not constitute plain error.

{¶ 68} As for defendant's claim that the trial judge restricted cross-examination regarding Lewis Ray's bad character, *e.g.*, whether police had previously arrested Ray, especially for dealing in food stamps, defendant was not prejudiced by the court's restriction because evidence that Lewis may have been dealing in stolen merchandise and food stamps was presented to the jury through defendant's own testimony and the testimony of police officers. Accordingly, we

reject Proposition of Law XIV.

### C.  Playing of 911 Tape

{¶ 69} In Proposition of Law XV, defendant contends that playing the 911 tape recording of the victim's son notifying police of the homicides was inadmissible hearsay, as well as irrelevant and highly prejudicial.  The trial court correctly ruled that the tape qualified as an excited utterance and did not constitute inadmissible hearsay.  "To be admissible under Evid.R. 803(2) as an excited utterance, a statement must concern 'some occurrence startling enough to produce a nervous excitement in the declarant,' which occurrence the declarant had an opportunity to observe, and must be made 'before there had been time for such nervous excitement to lose a domination over his reflective faculties. * * *' " *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, 1068, quoting paragraph two of the syllabus in *Potter v. Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E.2d 140.  See, also, *State v. Kinley* (1995), 72 Ohio St.3d 491, 497, 651 N.E.2d 419, 425; *State v. Simko* (1994), 71 Ohio St.3d 483, 490, 644 N.E.2d 345, 352.

{¶ 70} Defendant also contends that the relevancy of the tape and its prejudicial impact under Evid.R. 403(A) should have precluded admission.  However, defendant failed to object on that basis at trial and, given the nature and brevity of the relevant portion of the tape, we find that any inflammatory impact on the jury would be slight.  We find that the trial court did not abuse its discretion in admitting the tape into evidence.  See *State v. Lundgren* (1995), 73 Ohio St.3d 474, 486, 653 N.E.2d 304, 318; *Allen*, 73 Ohio St.3d at 636, 653 N.E.2d at 686.  Accordingly, we reject Smith's Proposition of Law XV.

### D.  Gruesome Photographs and Other Exhibits

{¶ 71} In Proposition of Law XVI, defendant argues that the trial court erred in admitting crime-scene and autopsy photographs that were both gruesome and cumulative in nature.  The admission of photographs is left to the discretion of the trial court.  Evid.R. 403; *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559

N.E.2d 710, 726; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. In order to be admissible, the probative value of a photograph must outweigh the danger of material prejudice to the defendant and the photograph must not be repetitive. See *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267, 274; *Maurer*, paragraph seven of the syllabus.

{¶ 72} Defendant urges this court to overrule *DePew*, in which we held that photographs of bloodstains are generally not gruesome. "The photos of blood stains * * * do not have a shock value equivalent to the photograph of a corpse. The term 'gruesome' in the context of photographic evidence should, in most cases, be limited to depictions of actual bodies or body parts." *Id.*, 38 Ohio St.3d at 281, 528 N.E.2d at 550. The photographs of blood and blood splatters in the kitchen were not gruesome so as to preclude their admission into evidence.

{¶ 73} Defendant claims that the twelve photographs of Lewis Ray in the kitchen and the twelve autopsy photographs of his body were cumulative in nature and were prejudicial. The court admitted the autopsy photographs because each one illustrated the coroner's testimony and demonstrated defendant's specific intent to kill. Details in the photographs, such as the depressed skull fracture caused by a hammer-like object, conflicted with defendant's version of the injuries he inflicted upon Lewis.

{¶ 74} The court determined that the photographs of Lewis in the kitchen were taken from different angles and showed the condition of the kitchen. "While it is true that the sheer number of photographs admitted may constitute error where they are needlessly cumulative, Evid.R. 403(B), the mere fact that there are numerous photos will not be considered reversible error unless the defendant is prejudiced thereby. Absent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." *Id.* Therefore, the court did not abuse its discretion by admitting the photographs. The probative value of the photographs outweighed any prejudicial

impact on the jury.

{¶ 75} The six autopsy photographs of the body of Ruth Ray also illustrated the coroner's testimony. We have reviewed the photographs and determined that they were not cumulative or inflammatory and that defendant was not prejudiced by their admission.

{¶ 76} We have reviewed the photographs of the crime scene and find that the trial court's decision to admit those photos did not constitute an abuse of discretion. The court's casual reference to the photographs as "excessively gruesome" or "excessively repetitive" does not indicate that the court used an incorrect legal standard when deciding upon their admissibility. The probative value of the photographs outweighed any danger of prejudice to defendant. We find that the admission of the photographs into evidence was not an abuse of discretion. See *Morales*, 32 Ohio St.3d at 258, 513 N.E.2d at 274; *Maurer*.

{¶ 77} In Proposition of Law XVII, defendant also contends it was error to admit numerous pieces of evidence directly connected to Randy Smith, such as Randy's boots, a stolen gun that was traced to Randy, photographs of Randy, and money and money orders either seized from or traced to him. However, because defendant and Randy jointly planned and executed the robbery and murders, this evidence helped prove defendant's guilt and corroborated details of defendant's confessions. Therefore, it was admissible.

{¶ 78} Defendant also claims that the court should not have reintroduced exhibits from the guilt phase of the trial during the sentencing phase. However, these exhibits were relevant to the nature and circumstances of the specified aggravating circumstances. See *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 352-356, 662 N.E.2d 311, 318-322; *State v. Woodard* (1993), 68 Ohio St.3d 70, 78, 623 N.E.2d 75, 81; *DePew*, paragraph one of the syllabus. Consequently, we reject Propositions of Law XVI and XVII.

*Jury Instructions*

{¶ 79} In Proposition of Law X, defendant contends that the trial court erroneously instructed the jury during both the guilt and penalty phases of the trial. However, but for an objection during the penalty phase to an instruction on mitigating factors, defendant did not object to the jury instructions given. Thus, he waived all but plain error. *Lundgren*, 73 Ohio St.3d at 493, 653 N.E.2d at 322.

{¶ 80} Defendant objected when the court denied his request to specifically instruct jurors on seven ostensible mitigating factors, *e.g.*, "ability to make a well behaved and peaceful adjustment to prison life," "victim of child abuse and substance abuse," "ability to lead a useful life in prison," and "deprived of parental nurturing." Six of the factors fit within defendant's "history, character, and background," on which the court did instruct the jury. However, the court did instruct the jury that it could consider "other factors" in its decision. All seven of the factors, including "remorse," may be categorized as "other factor[s]" within the meaning of R.C. 2929.04(B)(7). Consequently, we find no error and we reject Proposition of Law X. See *State v. Garner* (1995), 74 Ohio St.3d 49, 56, 656 N.E.2d 623, 632; *Landrum*, 53 Ohio St.3d at 122, 559 N.E.2d at 727.

*Prosecutorial Misconduct*

{¶ 81} In Proposition of Law VIII, defendant claims that he was denied a fair trial and due process because of pervasive prosecutorial misconduct. However, defendant's failure to object at trial to much of the alleged misconduct about which he now complains results in waiver of all but plain error. *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 82} Defendant claims that during *voir dire*, the prosecutor "embellished" the phrase, "a man's home is his castle," making it into a legal concept. Defendant did not object to the comment at the time. However, he now argues that he was prejudiced by this phrase because the location of the murders was irrelevant and he was not charged with burglary. This legal maxim relates "to the rights of an

individual to defend his house against violence, and his person against death." *State v. Nieto* (1920), 101 Ohio St. 409, 415, 130 N.E. 663, 664.  Accord *State v. Thomas* (1997), 77 Ohio St.3d 323, 327, 673 N.E.2d 1339, 1342.  Defendant claimed that Lewis Ray attacked him.  Defendant robbed the Rays in their home.  Reference to the Ray home was not irrelevant, and the prosecutor's reference to this phrase did not result in plain or prejudicial error.

{¶ 83} Defendant also claims that, during *voir dire*, the prosecutor improperly explained the concept of weighing of aggravating circumstances and mitigating factors during sentencing.   Again, there was no objection to these comments.  Furthermore, we find that the mere reference to these legal concepts during *voir dire* did not result in prejudicial or plain error.  See *State v. Campbell* (1994), 69 Ohio St.3d 38, 51, 630 N.E.2d 339, 352.

{¶ 84} Defendant claims that the court improperly permitted the prosecutor to ask leading questions of James Baker, a witness crucial to the state's case.  Evid.R. 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony."  Furthermore, the court exercises reasonable control over the mode of interrogation so that its presentation will effectively ascertain the truth.  Evid.R. 611(A).  In a sidebar conference, the court explained that it was exercising latitude to get at the truth in the examination of Baker because he appeared to be nervous and "a little slow" and "straining" with his answers.  We find that the court properly exercised its discretion and there was no error.  See, generally, *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 190, 616 N.E.2d 909, 914.

{¶ 85} We also find that the cross-examination of defendant did not constitute prosecutorial misconduct that affected the fairness of the trial.  See *State v. Benge* (1996), 75 Ohio St.3d 136, 142, 661 N.E.2d 1019, 1026; *Lundgren*, 73 Ohio St.3d at 488, 653 N.E.2d at 319-320.  During direct examination, defendant testified that he and James drove to the homicide scene and Baker talked with the

Rays' children. Defendant also testified that Lewis was like "a daddy" to him. Thus, the prosecutor's reference to the Rays' children was not outside the scope of cross-examination.

{¶ 86} Because defendant claimed that parts of his written confession to police were untrue, it was not improper for the prosecutor to ask defendant to identify those parts of his confession. Defendant's testimony also conflicted with the crime-scene photographs. Thus, it was not improper for the prosecutor to question defendant about the photographs in evidence.

{¶ 87} Defendant also claims that during closing argument in the guilt phase of the trial, the prosecutor improperly referred to defendant's testimony as "concocted." He also emphasized irrelevant information and argued that defendant lacked remorse for these crimes. As to the comment about defendant's "concocted" testimony, defendant waived all but plain error by failing to timely object. *Wogenstahl*, 75 Ohio St.3d at 356-357, 662 N.E.2d at 322. Later, when defendant did object to the comment and moved for a mistrial, the court sustained the untimely objection and gave the jury a thorough curative instruction. We presume the jury followed the instruction. See *State v. Wilson* (1972), 30 Ohio St.2d 199, 204, 59 O.O.2d 220, 223, 283 N.E.2d 632, 636. Thus, we do not find plain error.

{¶ 88} Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 300; *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 185, 263 N.E.2d 773, 777. The prosecutor's reference to defendant's lack of remorse may have been intended to question his credibility.

{¶ 89} Defendant claims there were numerous instances of prosecutorial misconduct during the penalty phase of the trial. Upon review of the record, we find that no misconduct occurred that would have affected the fairness of the trial. "Prosecutors can urge the merits of their cause and legitimately argue that defense

mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292, 309. See, also, *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. Further, the prosecutor could comment on the absence of defense witnesses. *State v. Bies* (1996), 74 Ohio St.3d 320, 326, 658 N.E.2d 754, 760; *D'Ambrosio*, 67 Ohio St.3d at 193, 616 N.E.2d at 916. Finally, defendant did not object to the prosecutor's closing argument. We find that no plain error exists. *Loza*, 71 Ohio St.3d at 82, 641 N.E.2d at 1104; *State v. Combs* (1991), 62 Ohio St.3d 278, 282, 581 N.E.2d 1071, 1076. Accordingly, we reject Proposition of Law VIII.

*Effective Assistance of Counsel*

{¶ 90} In Proposition of Law IX, defendant contends that his constitutional rights were violated because he was denied effective assistance of counsel during pretrial and trial proceedings. Defendant provides numerous instances of his counsel's alleged ineffectiveness and urges this court to focus on the "totality of the representation" in order to conclude that his counsel was ineffective.

{¶ 91} Reversal of a conviction or sentence based upon a claim of ineffective assistance of counsel requires that a defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373. We find that the performance of defendant's counsel did not fall "below an objective standard of reasonable representation." *Id.*, paragraph two of the syllabus. The cumulative effect of the perceived errors is not "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693.

{¶ 92} Defendant claims that his counsel did not arrange for him to undergo a drug screening test that was ordered by the court. However, defendant failed to

demonstrate how results of a drug test taken almost a week after these crimes occurred would be relevant to prove his intoxication the night the crimes occurred or at the time of his arrest and confession. Defendant also claims that his counsel should have developed evidence at a suppression hearing of defendant's intoxication at the time he was arrested and confessed to the crimes. Intoxication affecting one's state of mind, absent coercive police activity, would be an insufficient reason to exclude his voluntary confession. See *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473.

{¶ 93} We addressed defendant's complaints about counsel's actions during *voir dire* under his Propositions of Law VIII and XII. The record indicates that the court conducted a comprehensive *voir dire*. We cannot now second-guess counsel's tactical decisions.

{¶ 94} Defendant's counsel planned to have defendant testify and knew that he would have been subject to cross-examination on his 1987 conviction for attempted burglary. Thus, counsel's failure to seek severance of the prior offense specification pursuant to R.C. 2941.142 did not fall below the objective standard of representation. See Evid.R. 609; *State v. Bradley*, 42 Ohio St.3d at 145, 538 N.E.2d at 382.

{¶ 95} We find that counsel's tactical decisions throughout the guilt and penalty phases of the trial did not fall below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. Defendant has not demonstrated "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. We reject Proposition of Law IX.

*Sufficiency and Weight of the Evidence*

{¶ 96} In Proposition of Law XIII, defendant contends that the evidence is insufficient to sustain his convictions and, further, that his convictions are against

the manifest weight of the evidence. Having already determined that this court has power to assess the sufficiency and weight of the evidence, we must review those issues.

**{¶ 97}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict, *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, 546, whereas the "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' " (Emphasis *sic*.) *Id*. at 387, 678 N.E.2d at 546.

**{¶ 98}** In reviewing the record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. We find that the record contains sufficient evidence to support the jury's finding that defendant intended to kill both Lewis and Ruth Ray.

**{¶ 99}** The evidence indicates that, while at the Crystal Lounge, the Smith brothers planned to rob the Rays. The Smiths also decided "they were going to have to kill them * * * both" because they "didn't want [the Rays] to tell on them." Later, defendant told James that he struck Lewis in the head with a hammer. Lewis's skull fracture was consistent with a hammer blow. Russell's hammer later turned up missing from the car that defendant had borrowed. Defendant also told James that, after he killed Lewis, he kicked Ruth in the head to make sure she was also dead. Defendant's claim that he only intended to steal saws and drills from the Rays' back yard does not comport with other evidence produced at trial.

**{¶ 100}** There was also sufficient evidence that defendant directly aided in

Ruth's murder with prior calculation and design. Even if defendant did not personally strangle Ruth, the jury could reasonably find that his brother did in accordance with their agreed plan, and Kenneth then kicked her in the head to make sure she was dead. See *State v. Ballew* (1996), 76 Ohio St.3d 244, 249, 667 N.E.2d 369, 376. See *State v. Taylor* (1997), 78 Ohio St.3d 15, 676 N.E.2d 82; *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190; *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755.

{¶ 101} We find there was sufficient evidence for the jury to consider each of the three death penalty specifications. Defendant told James he had to kill both of the Rays so that he and Randy would not be identified. R.C. 2929.04(A)(3), the specification of purpose to escape detection, does not require the aggravated robbery of the Rays to have preceded their murders. See *Williams*, 74 Ohio St.3d at 576-577, 660 N.E.2d at 732; *State v. Lewis* (1993), 67 Ohio St.3d 200, 205, 616 N.E.2d 921, 925.

{¶ 102} R.C. 2929.04(A)(5) requires only that the offense was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender. There was sufficient evidence that defendant planned both murders, killed Lewis Ray, and directed and aided in the murder of Ruth Ray. There was also abundant evidence that the murders occurred in the course of aggravated robbery as required by R.C. 2929.04(A)(7).

{¶ 103} In accordance with R.C. 2953.02, we also find that the greater amount of credible evidence, or the manifest weight of the evidence, supports defendant's convictions. Following a review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find no basis to believe that the jury clearly lost its way, that a manifest miscarriage of justice occurred, or that defendant's convictions are against the manifest weight of the evidence. The jury could reasonably find that defendant's testimony at trial lacked credibility and defendant's oral confession to James just

hours after the crimes occurred and his subsequent statements to the police were more believable than his trial testimony. The jury could also reasonably find that defendant's confession, corroborated by the other evidence, established the elements of the offenses of which he was convicted. Accordingly, we reject Proposition of Law XIII.

## III

## SENTENCING ISSUES

### *Unsworn Statement*

{¶ 104} In Proposition of Law VI, defendant complains because the trial judge informed the jury that they could take into consideration the fact that the prosecution was not permitted to cross-examine defendant as to his unsworn statement made during the mitigation hearing.

{¶ 105} The court was simply attempting to explain to the jury that the state would not be cross-examining defendant. However, we need not decide whether the court's comment exceeded the boundary in *DePew*, 38 Ohio St.3d at 285, 528 N.E.2d at 554, because defendant's failure to object waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. See *Lundgren*, 73 Ohio St.3d at 493, 653 N.E.2d at 323; *Lorraine*, 66 Ohio St.3d at 418, 613 N.E.2d at 217. We find no plain error. Accordingly, we reject Proposition of Law VI.

### *Merger of Aggravating Circumstances and Cross-Appeal*

{¶ 106} The two murder charges filed against defendant contained three capital specifications: murder to escape detection, multiple murder, and murder in the course of aggravated robbery. R.C. 2929.04(A)(3), (5), and (7). At defendant's request, the trial court merged the three specifications into a single specification and instructed the jury to weigh the specifications as one aggravating circumstance. In Proposition of Law II, defendant contends that, despite the instruction, the court continued to emphasize three separate specifications so that the instruction created

one "super" aggravating circumstance. Consequently, defendant argues it was impossible for the jury to fairly balance the aggravating circumstances and mitigating factors. Defendant claims the court also erroneously instructed the jury to focus on the quality of the evidence, not the quantity.

{¶ 107} Because the court merged those specifications at defendant's request, he cannot now assert error. "A party cannot take advantage of an error he invited or induced." *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408, 422; *Center Ridge Ganley, Inc. v. Stinn* (1987), 31 Ohio St.3d 310, 313, 31 OBR 587, 590, 511 N.E.2d 106, 109. Furthermore, defendant did not object at trial to the instruction merging the three specifications. The failure to object constitutes a waiver of any claim of error but for plain error. *Underwood*, at the syllabus. We do not find that plain error exists.

{¶ 108} The court's repeated emphasis to the jury to consider "the quality of the evidence and not the quantity" served to negate any prejudice to defendant. In addition, we have independently determined that the aggravating circumstances outweighed the mitigating factors. See *Cook*, 65 Ohio St.3d at 527, 605 N.E.2d at 82; *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus.

{¶ 109} The state in its cross-appeal contends that the trial court improperly merged the multiple murder specification with the other two death specifications in both aggravated murder counts. Merger of specifications may occur when they are duplications and arise from the same act. However, the specifications for multiple-murder and for felony-murder represent distinct and separate aggravating circumstances. *Williams*, 74 Ohio St.3d at 579, 660 N.E.2d at 734; *State v. Frazier* (1991), 61 Ohio St.3d 247, 256, 574 N.E.2d 483, 490. They "are not duplicative since they did not arise from the same act or indivisible course of conduct." *Id.*, 61 Ohio St.3d at 256, 574 N.E.2d at 490. Therefore, as to both counts, the R.C. 2929.04(A)(3) and (A)(7) specifications are merged, but the R.C. 2929.04(A)(5)

specification should not have merged.

{¶ 110} Accordingly, we reject defendant's Proposition of Law II and sustain the state's cross-appeal.

*Consecutive Sentences*

{¶ 111} In Proposition of Law IV, defendant argues the trial court erred when it refused to allow defense counsel to inform the jury that the trial judge could impose consecutive rather than concurrent life sentences for the two murders. The court allowed counsel to comment on possible sentences within the jury's province, but informed counsel that "you may not tell the jury whether they can be consecutive or concurrent."

{¶ 112} In *Allard*, 75 Ohio St.3d at 492-493, 663 N.E.2d at 1287, we held the trial court properly instructed the jury, "You are not to speculate as to what sentence the Court is actually going to impose or whether the sentences will be run concurrent or consecutive." Accord *State v. Grant* (1993), 67 Ohio St.3d 465, 482, 620 N.E.2d 50, 69. Since a jury does not have the option of recommending whether the life sentences should run consecutively or concurrently, it is not a matter for the jury to determine. *Allard*, 75 Ohio St.3d at 492, 663 N.E.2d at 1287.

{¶ 113} We find the trial court did not err by refusing to allow defense counsel to discuss consecutive versus concurrent life sentences as potential penalties. This did not undermine the reliability of the capital sentencing process. Accordingly, we reject Proposition of Law IV.

*Death Penalty for Accomplice*

{¶ 114} In Proposition of Law III, defendant argues that the actions of the accomplice, not the principal offender, must be examined when the state seeks a death sentence for complicity. Defendant contends that for an accomplice to be eligible for the death penalty under the felony-murder specification, the accomplice must commit the murder with prior calculation and design. The Eighth Amendment does not prohibit the death penalty for an accomplice whose participation in the

felony murder was significant, and whose mental state is one of reckless indifference. *Tison v. Arizona* (1987), 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127.

{¶ 115} In *State v. Ballew*, 76 Ohio St.3d 244, 251, 667 N.E.2d 369, 377-378, we held that to sustain a conviction under R.C. 2929.04(A)(7), the felony-murder specification, the defendant need not be the actual killer or "principal offender" if the defendant acted with "prior calculation and design" in the aggravated murder. In *State v. Taylor* (1993), 66 Ohio St.3d 295, 306, 612 N.E.2d 316, 324, we explicitly recognized that an accessory could be sentenced to death for felony-murder. Accord *State v. Brown* (1988), 38 Ohio St.3d 305, 318, 528 N.E.2d 523, 539; R.C. 2923.03(F). Here, the jury specifically found that defendant purposely intended to kill Ruth Ray, and that he did so with "prior calculation and design" as an aider and abettor in her aggravated murder.

{¶ 116} Defendant's argument that he cannot be convicted of R.C. 2929.04(A)(5), the multiple-murder specification, because he did not personally kill Ruth ignores the evidence that the multiple killing was a planned, concerted effort by defendant and his brother. The jury's findings that defendant specifically intended to kill both Lewis and Ruth and that he acted with "prior calculation and design" and as an aider and abettor with respect to Ruth's murder, satisfied the constitutional safeguards relating to an accomplice's liability. See *Tison*.

{¶ 117} Defendant's conviction of the R.C. 2929.04(A)(3) specification of purpose to escape detection for both murders does not violate double jeopardy protections. The specifications differ in detail. One alleged that defendant murdered Lewis to escape detection for the aggravated robbery and the second one alleged that he murdered Ruth to escape detection for the aggravated robbery and for the aggravated murder of Lewis. Moreover, the two murder counts involved different persons. The specifications do not involve punishment for the same offense. Hence, they were not duplicative. See *State v. Jones* (1985), 18 Ohio St.3d

116, 18 OBR 148, 480 N.E.2d 408. Accordingly, we reject defendant's Proposition of Law III.

*Double Jeopardy*

{¶ 118} In Proposition of Law XVIII, defendant claims that his sentences for the two felony murders and for the underlying felonies violate the Double Jeopardy Clause. He argues that because felony-murder contains all the elements necessary to prove the underlying robbery, simultaneous punishment for both crimes constitutes double jeopardy. Defendant's argument is not persuasive. We have held that "[a]ggravated murder * * * is not an allied offense of similar import to aggravated robbery * * * for purposes of R.C. 2941.25(A)." *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 10 OBR 352, 461 N.E.2d 892, syllabus. See, also, *Frazier*, 73 Ohio St.3d at 342, 652 N.E.2d at 1016; *Grant*, 67 Ohio St.3d at 475, 620 N.E.2d at 63; R.C. 2941.25. Consequently, we find there is no violation of defendant's constitutional rights.

{¶ 119} Defendant also makes a double-jeopardy argument that he should be subject to a single prison sentence under R.C. 2941.25(A) because there was a single robbery and the two counts of aggravated robbery were allied offenses of similar import. However, injury is an element of aggravated robbery. Because defendant inflicted injuries on each victim, the offenses were separate. Cf. 1974 Legislative Service Commission Comment to R.C. 2941.25 ("[A] thief who * * * steals different property from three separate victims * * * can be charged with and convicted of all three thefts."). Accord *Jones*.

{¶ 120} Notwithstanding the above, defendant failed to object; thus, he waived these issues. *Wilson*, 74 Ohio St.3d at 400, 659 N.E.2d at 310; *Comen*, 50 Ohio St.3d at 211, 553 N.E.2d at 646. Therefore, we reject defendant's Proposition of Law XVIII.

*Trial Court Opinion*

{¶ 121} Defendant's Proposition of Law VII, that the trial court's written

opinion imposing the death penalty diminished the weight given to mitigating factors and inflated the significance of aggravating circumstances, lacks merit. We have repeatedly held that "the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *Lott*, 51 Ohio St.3d at 171, 555 N.E.2d at 305. See, also, *State v. Hill* (1995), 73 Ohio St.3d 433, 441, 653 N.E.2d 271, 280. Furthermore, our independent reassessment of the sentence will eliminate the effect of any deficiencies found in a trial court's sentencing decision. *State v. Eley* (1996), 77 Ohio St.3d 174, 186, 672 N.E.2d 640, 651; *State v. Fox* (1994), 69 Ohio St.3d 183, 191, 631 N.E.2d 124, 131.

IV

INDEPENDENT SENTENCE EVALUATION

{¶ 122} In Proposition of Law V, defendant argues that imposing the death penalty in his case is inappropriate, excessive, and disproportionate when compared with other cases. Defendant points to what he regards as abundant mitigating evidence produced at trial and also to the fact that his brother, Randy, received only a life sentence for the murders of Lewis and Ruth Ray.

{¶ 123} We continue to adhere to the statement set forth in *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, at paragraph one of the syllabus, that "[t]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." Because Randy received a life sentence and the record of his case is not before this court, we decline to include a review of Randy's case in our analysis of proportionality. *Id.*, 31 Ohio St.3d at 123, 31 OBR at 283, 509 N.E.2d at 395. Accord *State v. Green* (1993), 66 Ohio St.3d 141, 151, 609 N.E.2d 1253, 1262; see, also, *State v. Jamison* (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 188-189.

*Penalty Hearing*

{¶ 124} We will consider the appropriateness of the death penalty in this

case in the context of our independent evaluation of the sentence. At the penalty hearing, defendant presented a variety of mitigating evidence. His wife, Brenda, testified that she had known defendant as a child and that they had been married for eight years. Two children were born during the marriage, Kenneth, Jr., age eight, and Amanda, age five. Defendant treated Brenda and the children very well.

{¶ 125} Brenda testified that since she had known defendant, he had abused alcohol and drugs. His father was also an alcoholic. After his release from prison in 1989, defendant stopped "shooting up" drugs, but he continued to drink heavily and use marijuana. Aside from some "thieving to make money," Brenda testified that defendant also worked and drew Social Security disability benefits. She claimed that he stayed out of trouble and was not violent. However, on cross-examination, Brenda admitted that defendant told her that he had robbed the Rays and almost "cut Mr. Lewis Ray's head off." Brenda also admitted that she had looked over the jewelry stolen from the Rays and picked out items she liked and wanted to keep.

{¶ 126} Psychologist Janice Ort performed a wide variety of tests on defendant and examined numerous records. Defendant's IQ of 77 reflected low average intelligence. He exhibited characteristics of an antisocial personality disorder and was dependent on alcohol and sedatives, evidenced by a history of significant substance abuse. At age ten, defendant was using mood-altering substances. By age twelve, he was sniffing glue and using alcohol and marijuana. At age thirteen, he was using Valium, and by age fourteen shooting drugs intravenously. At age sixteen, he was using amphetamines and hallucinogens. At age nineteen, he was using cocaine. By age twenty-one, defendant had stopped injecting drugs, but continued to abuse sedatives, marijuana and alcohol. In April 1983, defendant was hospitalized for a week for severe depression and drug abuse with suicidal thoughts. In 1984, he was convicted of gross sexual imposition and served six months at a youth detention center, after which he underwent a one-

month inpatient treatment program for alcoholics, followed by outpatient drug counseling. He was later convicted of other offenses such as trespassing, assault, and petty theft and served short jail terms. In October 1987, he began a prison term for attempted burglary. Upon release in January 1990, he entered another drug counseling program; however, his drug and alcohol abuse continued.

{¶ 127} According to Dr. Ort, defendant's history and background suggest drugs and alcohol have caused organic brain impairment. After attending drug treatment programs, defendant's drug use temporarily abated. Dr. Ort testified that if defendant were placed in the same setting and conditions, a very great possibility exists that he would kill again. However, if he were in prison, away from drugs and alcohol, he could adjust and adapt well. Psychologist Jeffrey L. Smalldon agreed with Dr. Ort's findings that defendant suffered from a "relatively mild degree" of "brain impairment" as a result of heavy drinking on a daily basis, his abuse of barbiturates and antianxiety medications, and his history of sniffing lacquer, glue, and gasoline. Despite these "profound problems," defendant had functioned well in jail as "an excellent worker" and was "someone who never create[d] disturbances."

{¶ 128} In an unsworn statement, defendant said he was born in November 1965, making him twenty-nine at the time of the offenses. Defendant stated that by age thirteen, he was stealing to support himself and his drug habit. He would sell stolen bikes and other things to Lewis Ray. When he was fourteen, his mother died. Afterward, his alcoholic father did not take care of the four children. Defendant lived on the street or wherever he could find a place to stay. Before his arrest for these murders, defendant stated that he had worked installing drywall and in auto shops. He was also receiving Social Security disability payments because of his drug addiction and alcoholism.

{¶ 129} Defendant said he was "still in shock" over what happened because Lewis "was just like my father." He expressed remorse to the Rays' family and

appreciation to his own family for standing by him. He said he hoped to influence his own children in the future to stay out of trouble. Defendant explained that he has adjusted well in jail and gets along with the guards and other inmates. When he was in prison before, he also got along well, helped make furniture, and participated in schooling and drug therapy programs.

*Sentence Assessment*

{¶ 130} After independent assessment, we find that the evidence proves beyond a reasonable doubt the aggravating circumstances charged against defendant. Defendant killed both Lewis and Ruth Ray to escape detection for other crimes, R.C. 2929.04(A)(3); as part of a course of conduct to kill two or more, R.C. 2929.04(A)(5); and during an aggravated robbery, R.C. 2929.04(A)(7). We have agreed that the R.C. 2929.04(A)(3) and (A)(7) specifications are merged and consider them as a single specification. (See discussion, Proposition of Law II.)

{¶ 131} As to mitigating features, we find nothing in the nature and circumstances of the offense to be mitigating. Defendant devised a plan to rob and kill an elderly couple who had befriended him and his brother. Defendant and Randy secured entry at night into their friends' home, then, as they had planned, defendant brutally murdered Lewis while his brother killed Ruth. After killing and robbing the Rays, they rejoined their other friends in drinking and enjoying themselves.

{¶ 132} We find nothing in defendant's character remotely mitigating: even his good friends knew him as a thief. But his history and background do offer modest mitigating features. His mother died when he was fourteen, and his alcoholic father did not support or assist the family. At fourteen, defendant stole to support himself and his acquired drug habit. Defendant's very substantial history of drug abuse and multiple drug-dependence stretching back to his preteens deserve some weight. *Landrum*, 53 Ohio St.3d at 125, 559 N.E.2d at 730. Yet, despite the opportunities provided to him when he underwent several drug rehabilitation

programs, he never dealt effectively with his drug dependences.

{¶ 133} We find that the statutory mitigating factors in R.C. 2929.04(B)(1) through (B)(5) are inapplicable. As to the R.C. 2929.04(B)(1) factor, defendant claimed that Lewis acted as a fence to buy stolen property from him. Yet Lewis was clearly not involved in any illegal activity when defendant killed him. Defendant also claimed that he and Lewis argued and that Lewis was the aggressor. However, the jury rejected that claim. Accordingly, we find no basis to apply R.C. 2929.04(B)(1) as a mitigating factor. See *State v. Clark* (1988), 38 Ohio St.3d 252, 263, 527 N.E.2d 844, 856.

{¶ 134} Defendant was not under any "duress, coercion, or strong provocation"; hence, R.C. 2929.04(B)(2) is inapplicable. Despite testimony from two psychologists, no evidence exists that defendant lacked substantial mental capacity under R.C. 2929.04(B)(3). His drug dependence does not qualify as a mental disease or defect. See *State v. Slagle* (1992), 65 Ohio St.3d 597, 614, 605 N.E.2d 916, 931. Defendant was twenty-nine at the time of the offense and had a significant criminal record; hence, R.C. 2929.04(B)(4) and (B)(5) do not apply. The R.C. 2929.04(B)(6) mitigating factor (degree of participation in the offense) was relevant, but only as to the murder of Ruth Ray.

{¶ 135} We recognize that several mitigating R.C. 2929.04(B)(7) "other factors" exist, although their combined weight is marginal. Psychological testimony suggested that defendant suffered from mild brain impairment, and his significant drug abuse over many years contributed to that problem. At trial, defendant expressed remorse over killing his friend Lewis, but given defendant's remarks to James Baker shortly after the murders, we question his sincerity. The fact that defendant has the support and love of his wife and two children militates against the death penalty. Defendant's cooperation with police was also a mitigating factor. Further, we give some slight mitigating weight to evidence that defendant adjusts well in prison, once he is removed from the influence and

availability of drugs. See *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1.

{¶ 136} As to appropriateness of the sentence, defendant argues that he should not receive the death penalty because the jury trying Randy's case did not recommend the death penalty. Since both brothers had the same background and upbringing, and committed the same offenses, defendant argues that he should not receive a death sentence when Randy did not. However, the jury's independent verdict of a life sentence in Randy's case cannot control the jury's recommendation in defendant's case; nor can the verdict in Randy's case affect our own independent evaluation of defendant's case. As we have said before, "disparity of sentence does not justify reversal of a death sentence when that sentence is neither illegal nor an abuse of discretion." *Green*, 66 Ohio St.3d at 151, 609 N.E.2d 1253, 1261; *Jamison,* 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 188.

{¶ 137} In addition, while the offenses were the same, the evidence before the juries could not have been identical. Each brother's role in the offenses differs. Defendant's testimony indicates that he, not Randy, came up with the initial idea to rob and kill the Rays. Additionally, defendant showed little remorse, but Randy may have demonstrated more remorse. In fact, we have no knowledge of what mitigating evidence was presented in Randy's sentencing hearing. Hence, we reject any claim that the jury's verdict in Randy's case should control our decision.

{¶ 138} As to Count One, we have concluded that the two aggravating circumstances, R.C. 2929.04(A)(7) and (A)(5), outweigh the very modest mitigation offered beyond a reasonable doubt. Defendant murdered and robbed his elderly friend, Lewis, in Ruth's presence and within the sanctity of their home. Defendant did so brutally by nearly cutting Lewis Ray's head off, and his motive was greed. We find that the aggravating circumstances, weighed together, are very strong when compared with the very modest mitigating factors offered.

{¶ 139} In other aggravated-robbery/aggravated-murder cases, we have

found the death penalty appropriate despite stronger mitigation. Compare *Carter*, 72 Ohio St.3d 545, 651 N.E.2d 965; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 652 N.E.2d 988; *Slagle*, 65 Ohio St.3d 597, 605 N.E.2d 916. Also, in other cases, we have found the multiple-murder specification to outweigh significant mitigating evidence. See *State v. Awkal* (1996), 76 Ohio St.3d 324, 667 N.E.2d 960; *Lorraine*, 66 Ohio St.3d 414, 613 N.E.2d 212.

{¶ 140} As to Count Two, we find that the R.C. 2929.04(A)(5) and (A)(7) aggravating circumstances also outweigh the mitigation offered beyond a reasonable doubt, even considering the additional R.C. 2929.04(B)(6) mitigating factor. Defendant planned, with "prior calculation and design," the murder of frail and elderly Ruth Ray, in her own home, at night, in the presence of her husband. After his brother killed her, defendant said he kicked Ruth in the head to make sure she was dead. Even though defendant only aided, abetted, and planned Ruth's murder, and was not the principal offender in her murder, we have still determined that the aggravating circumstances outweigh mitigating factors and that he should also receive the death sentence for her murder.

{¶ 141} Imposing the death penalty in this case is neither excessive nor disproportionate when compared with the penalty imposed in other cases of felony-murder during an aggravated robbery. *Allen*, 73 Ohio St.3d 626, 653 N.E.2d 675; *State v. Mack* (1995), 73 Ohio St.3d 502, 653 N.E.2d 329; *Hill*, 73 Ohio St.3d 433, 653 N.E.2d 271; *Woodard*, 68 Ohio St.3d 70, 623 N.E.2d 75; *Lewis*, 67 Ohio St.3d 200, 616 N.E.2d 921; *Green*, 66 Ohio St.3d 141, 609 N.E.2d 1253; *Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972, including cases cited at 62 Ohio St.3d at 377-378, 582 N.E.2d at 989.

{¶ 142} The death penalty is also proportionate when compared with prior "course of conduct" murder cases. *Williams*, 74 Ohio St.3d 569, 660 N.E.2d 724; *Dunlap*, 73 Ohio St.3d 308, 652 N.E.2d 988; *Loza*, 71 Ohio St.3d 61, 641 N.E.2d 1082; *Grant*, 67 Ohio St.3d 465, 620 N.E.2d 50; *Lorraine*, 66 Ohio St.3d 414, 613

N.E.2d 212; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Montgomery* (1991), 61 Ohio St.3d 410, 575 N.E.2d 167; and *Combs*, 62 Ohio St.3d 278, 581 N.E.2d 1071, including cases cited at 62 Ohio St.3d at 294, 518 N.E.2d at 1084.

{¶ 143} Accordingly, we sustain the state's Proposition of Law I in its cross-appeal in case No. 96-677, by reversing the trial court's finding that the death penalty specifications in R.C. 2929.04(A)(5) and (A)(7) are merged.

{¶ 144} We affirm the court of appeals judgment in case No. 96-678, which dismissed defendant's appeal to that court finding that the court of appeals lacked jurisdiction over the appeal.

{¶ 145} Otherwise, we affirm defendant's convictions and sentence, including the death sentences.

*Judgment accordingly*.

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

_____