OPINION *Page 2 
{¶ 1} Defendant-appellant Lloyd E. Luikart appeals the judgment of the Marion County Municipal Court finding him guilty of reckless op ration of a motor vehicle. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On December 11, 2005, Luikart was driving his vehicle when he was involved in a car accident with a vehicle driven by his ex-mother-in-law, Wanda Taylor. Officer Chad Campese investigated the accident but did not issue any citations. Instead, Officer Campese sent his report to the prosecutor's officer for review for possible charges as to Luikart. Thereafter, the prosecutor charged Luikart with reckless operation of a motor vehicle, in violation of R.C. 4511.20.
 {¶ 3} The trial court held a bench trial on April 20, 2006, and took the matter under advisement. On June 2, 2006, the trial court issued a written judgment which found Luikart guilty. The trial court fined Luikart $35.00 and ordered him to pay court costs.
 {¶ 4} It is from this judgment that Luikart appeals and sets forth two assignments of error for our review. For clarity of analysis, we have combined Luikart's assignments of error. *Page 3 
 ASSIGNMENT OF ERROR NO. I The evidence presented at trial was insufficient and did not support the trial court's finding that on or about December 11, 2005, the Appellant committed the offense of Reckless Operation.
 ASSIGNMENT OF ERROR NO. II The trial court's conviction of the Appellant for Reckless Operation is against the manifest weight of the evidence.
 {¶ 5} In his first assignment of error, Luikart argues that his conviction for reckless operation was not supported by the sufficiency of the evidence because the prosecution failed to establish that Luikart acted with willful or wanton disregard. Luikart, in his second assignment of error, argues that his conviction was against the manifest weight of the evidence.
 {¶ 6} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in State v. Smith (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.
 {¶ 7} However, when determining whether a conviction is against the manifest weight of the evidence a reviewing court must examine the entire record, *Page 4 
" ` [weigh] the evidence and all reasonable inferences, [consider] the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717.
 {¶ 8} R.C. 4511.20(A) states, "No person shall operate a vehicle, trackless trolley, or streetcar on any street or highway in willful or wanton disregard of the safety of persons or property." The Ohio Supreme Court has noted that willful conduct "implies an act done intentionally, designedly, knowingly, or purposely, without justifiable excuse."State v. Earlenbaugh (1985), 18 Ohio St.3d 19, 21, 479 N.E.2d 846, citing Black's Law Dictionary (5Ed. 1979) 1434. Wanton conduct, on the other hand, is defined as "an act done in reckless disregard of the rights of others which evinces a reckless indifference of the consequences to the life, limb, health, reputation, or property of others." Id. at 21-22.
 {¶ 9} Wanda Taylor testified that on December 11, 2005 she drove Carma to the Marion Police Department in order to pick up Carma's sons, Alex and Aaron, following a visitation with their father, Luikart. According to Wanda, Alex and Aaron would not get into her vehicle so, after waiting for about half an hour, Carma went to get a police officer. While Carma was in the police department, *Page 5 
Aaron and then Alex left their father's car and got into Wanda's car, and Wanda pulled around the parking lot to pick up Carma.
 {¶ 10} Wanda further testified that after Carma got into her car, Luikart pulled out of the parking lot and circled back around. Wanda stated that she saw Luikart's vehicle come to a complete stop and saw his car sit there even though he did not have a stop sign. Wanda further testified she waited a few minutes and his vehicle just sat there, so she then turned out of the parking lot. According to Wanda, Luikart came around the curve, sped up, and purposely hit her vehicle. Wanda testified that after the accident she moved her car because she was afraid Luikart was going to "ram" her car again.
 {¶ 11} Carma Taylor, Luikart's ex-wife and a passenger in Wanda's car, testified the she was at the police department to exchange Alex and Aaron. Carma testified that the boys would not get out of Luikart's car. Although Aaron eventually got out of Luikart's car, Alex would not get out of the car, so she went into the police department and called the dispatcher. According to Carma, she saw Luikart pull out of the parking lot, she called the dispatcher back to cancel the police officer, and she got into Wanda's car.
 {¶ 12} Carma further testified as follows:
 A * * * [Luikart] was just going really slow. I mean he was like creeping like a turtle before he got to the stop sign, and, um, he almost came to a stop. I don't even know if he came to a complete stop there at the stop sign, and he was going so slow, *Page 6 creeping. And [Wanda] went ahead to pull out of the parking lot, and he just like floored it and turned that corner, just slammed right into us.
 Q So was he into his turn at all when your mom starts coming out of the park —
 A When mom first started going out — the parking lot's really wide there. When she started easing out, she doesn't drive real fast anyway, when she . . . she starts going out, that's when I saw Luke turn the corner, start coming at her. And my thought was he's going to hit us, and mom just kept going * * *.
Carma also stated that Luikart had accelerated and intentionally hit Wanda's car.
 {¶ 13} Both Officer Campese and Officer Jeremy McCullough testified that a car traveling on Holmes Place would have the right of way over someone exiting the parking lot. Officer Campese testified that he heard the "crunch" of the accident but did not see the accident. Further Officer Campese testified that he did not hear any tires squeal, that he did not hear an engine accelerate, and that he was unable to gather any skid marks because the roads were wet. Officer Campese testified that he did not cite Luikart, that in his report he noted that he could not prove what caused the accident because all he had were the various conflicting statements, and that he sent the report to the prosecutor's office for review on possible charges against Luikart but not for any charges against Wanda.
 {¶ 14} Luikart and Carma's sons, Aaron and Alex, were in Wanda's vehicle when the accident occurred. Aaron testified that he was playing a game and was not paying attention; however, he did not feel Wanda stop, nor did he hear any *Page 7 
engines revving or tires squealing. Alex testified that it looked like Luikart was traveling at a normal speed. Further, Alex testified:
 Q Okay. Did he ever come to a stop on that road?
 A My dad?
 Q Yeah.
 A No, like he just like turned and then my grandma just kept going out. My grandma didn't slow down or anything, and then when they crashed, she just, uh, — she drove off like away from the accident so.
 {¶ 15} Luikart testified that the accident occurred after he and Carma exchanged their children. Luikart stated that he had gone shopping with Aaron and Alex over the weekend, and the boys had a lot of things strewn about the car that they needed to gather. After a couple of minutes, Wanda rolled down her window and screamed at the boys to "come on" so Luikart screamed back that they were coming. Aaron and then Alex got out of his car. Luikart testified that he left the parking lot even though he was aware that Carma went into the police department to get a police officer.
 {¶ 16} According to Luikart, he went around the block in order to come back and see if there was a problem. Luikart stated,
 A * * * I turned west on Holmes Street and went down to, I think, Garden Street, down to Church Street. I got to thinking, I thought I better swing back by there, make sure everything, you know, they're out of here, gone, everything's okay about getting a police officer. *Page 8 
 So I was coming up, uh, Union Street there and, uh, as I was coming around the corner, I didn't stop, I didn't slow down. I was just driving like I always drive. Uh, came around the corner, not accelerating, just coming around the corner like you normally come around the corner. Even Mr. Campese was out back when this happened. He testified that he didn't hear no motors. It's a big car. It's got a big V-8 in it. If I had that motor to the floor, Mr. Campese would have heard that because he's 60, 75 feet away from the accident.
 Q So — so you were coming around the corner?
 A I was coming around the corner. Uh, here they come, flying out of the parking lot. I was braking. I almost got stopped. I mean there's $60.00 worth of damage to my car. Broke a tail lens, put a little scratch on the bumper. Yeah.
According to Luikart's testimony, he was traveling approximately 15 miles per hour when he went around the corner, and that there was not very much damage from the accident because he was stopping his car. Luikart also testified that he thought a police officer might be present and he would not commit a crime knowing that a police officer would be present.
 {¶ 17} At the trial, Luikart stated that he was paralyzed and, as a result, his car had to be equipped with hand controls. According to Luikart, he would not be able to rent a car and would be out of a car for several days if his car was destroyed. Further, Luikart testified that he loved his children and he knew his children were in Wanda's car. *Page 9 
 {¶ 18} As previously noted, Luikart was convicted of reckless operation pursuant to R.C. 4511.20, which provides, "No person shall operate a vehicle, trackless trolley, or streetcar on any street or highway in willful or wanton disregard of the safety of persons or property." Wanda and Carma testified that Luikart accelerated his car and intentionally hit Wanda's car. Willful conduct, under the statute, includes intentional acts. See Earlenbaugh, 18 Ohio St.3d at 21.
 {¶ 19} After reviewing the evidence in a light most favorable to the prosecution, we find, based upon the foregoing testimony, that there was sufficient evidence for the trier of fact to find Luikart guilty of reckless operation under R.C. 4511.20.
 {¶ 20} Luikart also maintains that his conviction was against the manifest weight of the evidence. As a basis for his argument, Luikart points out that Wanda failed to yield when she exited the parking lot, that Wanda and Carma's testimony conflicts, that Alex saw his dad driving at a normal rate of speed, that Officer Campese did not hear any tires squealing or engines revving, that Officer Campese did not issue any citations, and that there was minimal damage to his car from the accident.
 {¶ 21} In the present case, Aaron testified that he did not feel Wanda stop the car and Alex testified that he did not think Wanda stopped as she was coming out of the parking lot. Luikart testified that Wanda did not even slow down as she *Page 10 
was coming out of the parking lot. However, Wanda testified that she sat in the police parking lot and watched Luikart and when he stopped and did not move, she then started pulling out.
 {¶ 22} Officer Campese and Aaron testified that they did not hear any squealing tires or revving engines, and Alex testified that he saw Luikart driving at a regular speed. Nevertheless, both Wanda and Carma testified that Luikart accelerated prior to the accident and hit Wanda's car on purpose.
 {¶ 23} Although there is some conflicting testimony regarding the accident, this does not mean that Luikart's conviction was against the manifest weight of the evidence. "A conviction is not against the manifest weight of the evidence merely because there is conflicting evidence before the trier of fact." State v. Haydon (Dec. 22, 1999), 9th Dist. No. 19094, at *7, citing State v. Gilliam (Aug. 12, 1998), Lorain App. No. 97CA006757, at 4. While Officer Campese did not issue Luikart a citation following the accident, he forwarded a copy of his report for a review on possible charges on Luikart but not for charges against Wanda. Both Wanda and Carma testified that Luikart accelerated his car and purposely hit Wanda's car. The damage to Luikart's car appears to be much more than the $60.00 to which he testified but was not severe. However, the extent of the damage does not disprove that Luikart purposely hit Wanda's car. *Page 11 
 {¶ 24} Credibility determinations are primarily a matter for the trier of fact since the trier of fact is in a better position to observe the demeanor of the witnesses and weigh their credibility. State v.DeHass (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. The judgment entry in this case implies that the trial court did not find Luikart credible.
 {¶ 25} After reviewing the entire record, we are unable to find that the trier of fact clearly lost its way or created a manifest miscarriage of justice in this case. Luikart's first and second assignments of error are, therefore, overruled.
 {¶ 26} Having found no error prejudicial to appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 ROGERS, P.J., and SHAW, J., concur. *Page 1