[Cite as *State v. Purdy*, 2013-Ohio-4105.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  1-12-56

    v.

WILLIAM H. PURDY,                 O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Allen County Common Pleas Court
Trial Court No. CR2012 0249

Judgment Affirmed and Sentence Vacated in Part

Date of Decision:   September 23, 2013


APPEARANCES:

    *Michael J. Short*  for Appellant

    *Terri L. Kohlrieser*  for Appellee

**PRESTON, P.J.**

{¶1} Defendant-appellant, William H. Purdy, appeals the Allen County Court of Common Pleas' judgment entry of conviction. For the reasons that follow, we affirm the judgment of conviction; however, we remand for resentencing pursuant to R.C. 2929.191 for the trial court to impose a five-year mandatory term of post-release control ("PRC") and to properly incorporate notice of the same in its judgment entry of sentence.

{¶2} On July 12, 2012, the Allen County Grand Jury indicted Purdy on Counts One through Six of rape, violations of R.C. 2907.02(A)(1)(b) and first degree felonies, with specifications that the victim was under the age of thirteen; and, Counts Seven and Eight of gross sexual imposition, violations of R.C. 2907.05(A)(4) and third degree felonies. (Doc. No. 1).[1]

{¶3} On July 23, 2012, Purdy entered pleas of not guilty at arraignment. (*See* Doc. No. 3).

{¶4} On October 12, 2012, Purdy filed a written waiver of his right to a jury trial. (Doc. No. 38).

{¶5} On October 22, 2012, the matter proceeded to a bench trial. (Doc. No. 45). Prior to the presentation of its case-in-chief, the State moved to dismiss Counts Seven and Eight of the indictment, which was granted. (*Id.*). Thereafter,

---

[1] Counts Five and Six were for complicity to rape, although charged as the principal offense in the indictment as permitted under R.C. 2923.03(F). (Bill of Particulars, Doc. No. 41).

the trial court found Purdy guilty on Counts One, Two, Three, and Four of Rape, and Counts Five and Six of Complicity to Rape, with all counts carrying specifications that the victim was under thirteen years old. (*Id.*); (Doc. No. 48).

{¶6} On November 2, 2012, the trial court filed its judgment entry of conviction. (Doc. No. 48).

{¶7} On November 14, 2012, the trial court sentenced Purdy to mandatory life imprisonment with parole eligibility after ten years on each of Counts One through Six. (Doc. No. 51); (Nov. 14, 2012 Tr. at 11-13). The trial court ordered that the terms imposed in Counts One and Two run concurrently to each other; the terms imposed in Counts Three and Four run concurrently to each other; and, the terms imposed in Counts Five and Six run concurrently to each other. (*Id.*); (*Id.*). However, the trial court further ordered that the term imposed on Counts One and Two run consecutive to the term imposed on Counts Three and Four; and, the terms imposed in Counts Five and Six run consecutive to the terms imposed in Counts One, Two, Three, and Four for an aggregate sentence of three terms of life imprisonment with parole eligibility after 30 years. (*Id.*); (*Id.*).

{¶8} On November 19, 2012, the trial court filed its judgment entry of sentence. (Doc. No. 51).

{¶9} On December 4, 2012, Purdy filed a notice of appeal. (Doc. No. 55). Purdy raises two assignments of error, which we elect to address together.

## Assignment of Error No. I

**The conviction was against the manifest weight of the evidence.**

## Assignment of Error No. II

**There was insufficient evidence to sustain the conviction.**

{¶10} In his first assignment of error, Purdy argues that his conviction is against the manifest weight of the evidence because the witnesses against him were not credible. In particular, Purdy argues that the victim made the allegations against him after she admitted to making up similar allegations against her stepfather as a way to garner sympathy and get out of trouble for violating curfew. Purdy argues that the testimony of his codefendant, Trisha Steele, is also not credible because she did not disclose Purdy's involvement until she was being investigated herself for sexual conduct with the victim, and Steele was given a significantly reduced sentence for her cooperation.

{¶11} In his second assignment of error, Purdy argues that, absent the non-credible testimony of the victim and his codefendant, his convictions were not supported by sufficient evidence.[2]

{¶12} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and

---

[2] Normally, we would consider sufficiency of the evidence prior to manifest weight; however, in this case Purdy's sufficiency argument depends upon the same credibility arguments he raises in his manifest weight assignment of error. Therefore, we will address the manifest weight argument first here.

[determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶13} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus, superseded by state constitutional amendment on other grounds in *State v. Smith*, 80 Ohio St.3d 89 (1997). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶14} The State presented the testimony of five witnesses at trial. Renee Owen testified that the victim, A.P., was her biological daughter, and Purdy, a.k.a. "Billy," was A.P.'s biological father. (Oct. 22, 2012 Tr. at 19-21). Owen testified that A.P. was born in August 1998, and A.P. was fourteen years old. (*Id.* at 20).

Owen testified that A.P. was never married to Purdy, and that Purdy was not part of A.P.'s life until she was five years old, when Purdy came to Owen's house and indicated that he wanted to be a father and spend time with A.P. (*Id.* at 21-22). Owen testified that she allowed Purdy to visit A.P. every other weekend and other times during the week if he wanted to take her fishing, shopping, out to eat, or something along those lines. (*Id.* at 23). Owen testified that, when Purdy began visiting A.P., he was living on Vine Street, and then he moved to Roberts, where he resided with his girlfriend, Trish. (*Id.* at 24). Owen testified that, around October 2005, Purdy had to leave Lima, so she stopped allowing Purdy to visit A.P. (*Id.* at 25). A few years later, Purdy and A.P. reconnected through Facebook, and Owen allowed Purdy to visit A.P. one time, in a supervised setting, to apologize for what happened in October 2005. (*Id.*). Owen testified that she never allowed A.P. to go over and stay with Purdy after he apologized. (*Id.* at 26).

{¶15} On cross-examination, Owen testified that A.P. does get into trouble, including violating curfew and riding in a car with another fourteen-year-old. (*Id.* at 27). Owen testified that she grounded A.P. for two weeks for sneaking out of the house. (*Id.* at 30). Owen testified that the allegations against Purdy were initiated after A.P. told someone at school that Owen's current husband, A.P.'s stepfather, touched A.P. (*Id.* at 28-29). Owen testified that she initially believed A.P. even though she did not want to believe her, but now Owen does not believe

it really happened. (*Id.* at 29). Owen testified that Purdy began visiting A.P. around the fall of 2003, when he was living on Vine Street with his girlfriend, Trish, and his father. (*Id.* at 31-32). Owen further testified that, within a couple months of allowing Purdy visitation with A.P., she began allowing A.P. to spend the night with Purdy. (*Id.* at 32-33). Owen testified that, when A.P. began visiting Purdy in the fall of 2003, A.P. had just turned five years old the previous August (2003). (*Id.* at 34). Owen recalled that A.P.'s first overnight visits with Purdy occurred during Christmas of 2003, though she thought there may have been a couple times prior to that, as well. (*Id.* at 35). Owen testified that the visits with Purdy continued into 2004 and 2005 when A.P. was five and six years old, though she could not recall when Purdy moved to Roberts. (*Id.*). Owen testified that, during 2004 and 2005 when Purdy was living on Roberts, A.P. visited Purdy for multiple-night visits. (*Id.* at 36). Owen testified that A.P. enjoyed visiting Purdy; she wanted A.P. to visit Purdy; and, she never suspected anything inappropriate was occurring during the visits. (*Id.*).

{¶16} On re-direct examination, Owen testified that she remembered that A.P. visited Purdy when he lived on Vine Street more than once overnight. (*Id.* at 37). She also testified that A.P. spent every other weekend and some weeknights with Purdy when he lived on Roberts for a few-month period. (*Id.* at 38).

{¶17} A.P. testified that she lives with her mother, Renee Owen, and she was born August 1998. (*Id.* at 41). She testified that she has never been married, and Purdy is her biological father. (*Id.* at 41-42). A.P. testified that she remembers seeing Purdy regularly when she was around four years old. (*Id.* at 42-43). She testified that Purdy was living on Vine Street with his girlfriend, Trish, Trish's son, Raven, and her grandfather, when she first started visiting him, but Purdy later moved to Roberts. (*Id.* at 43-44). A.P. testified that, when Purdy moved to Roberts, Trish and Raven lived with him, and Raven was about five years old at that time. (*Id.* at 44-45). A.P. testified that Raven and she slept in the attic at the house on Roberts, which house she testified was depicted in State's exhibit one, and Purdy and Trish slept downstairs. (*Id.* at 45-46).

{¶18} A.P. testified that she became sexually involved with Purdy when he was living on Vine. (*Id.* at 47). A.P. testified that Purdy taught her how to finger herself by using his hands or her hands. (*Id.* at 48). A.P. testified that Purdy would put his fingers into her vagina, and he would take her fingers and place them into her vagina. (*Id.* at 48-49). A.P. could not recall how many times this occurred, but she recalled that it occurred more than twice, and they were in the upstairs bedroom on Vine. (*Id.* at 49). A.P. testified that Purdy continued to do sexual things with her when he moved to Roberts. (*Id.* at 50-51). A.P. testified that Purdy would lick her vagina, which occurred more than once. (*Id.* at 51).

A.P. testified that this occurred in Purdy's room, and she recalled pulling Purdy's head closer to her when he was licking her vagina. (*Id.* at 52). When asked why she pulled Purdy's head closer, A.P. testified that "[i]t felt good to me. It didn't feel wrong." (*Id.* at 53).

{¶19} A.P. also testified that Purdy called his girlfriend, Trish, into the room and told Trish to "go down on [her]," so Trish licked her vagina. (*Id.* at 53-54). A.P. testified that she could not recall how many times Trish licked her vagina but it was more than once. (*Id.* at 54-55). A.P. could not recall what Purdy was doing when Trish was performing oral sex on her, but A.P. testified that Purdy was present. (*Id.* at 55). She also testified that, at some point, Trish stopped participating in these sexual incidents, and A.P. recalled that Trish and Purdy discussed it. (*Id.*). A.P. testified that she heard Trish tell Purdy that what they were doing was wrong, and it should not be going on. (*Id.* at 56). A.P. testified that, after Trish told Purdy it was wrong, Trish stopped performing oral sex on her, but Purdy continued to lick her vagina. (*Id.* at 56-57).

{¶20} A.P. testified that she recalled a time when her mother would no longer allow her to visit Purdy, and she had only reconnected with Purdy in the last few years through Facebook. (*Id.* at 57). A.P. testified that her mother allowed Purdy to come visit her at their house, but her mother would not allow her to visit Purdy. (*Id.* at 58). A.P. testified that she did go visit Purdy once or twice

without her mother's knowledge, and Purdy still lives on Roberts but in a different house. (*Id.* at 59).

**{¶21}** A.P. testified that, earlier in the year, she reported to children services and Investigator Tiffany Najmulski of the Lima Police Department that her stepfather came into her room and tried to touch her. (*Id.* at 60). A.P. testified that the previous weekend she had been arrested for violating curfew and was in big trouble, and shortly after that incident, she first told a school nurse about her stepfather, Thomas Owen, touching her. (*Id.* at 60-61). A.P. testified that, after she made the allegation to the school nurse, children services began investigating, and she told the investigator that her stepfather came into her room, asked her if she wanted her radio back, gave her a pill, came back a few minutes later, and tried to remove the blanket and touch her. (*Id.* at 62). A.P. testified that her stepfather did come in the room, return her radio, and give her a sleeping pill, but he never tried to touch her. (*Id.* at 62-63). A.P. testified that she made up the allegations against her stepfather to garner sympathy and escape punishment for her curfew violation. (*Id.* at 63).

**{¶22}** A.P. testified that she also made allegations against Purdy after the investigator asked her if anyone else had ever touched her. (*Id.* at 63-64). A.P. testified that, a few days later, she told the investigator that she made up the story about her stepfather touching her, but that her biological father did actually touch

her. (*Id.* at 65). She further testified that she initially told the investigator that Purdy made her touch his penis with her hands; however, she had since remembered that she voluntarily touched his penis. (*Id.* at 65-66). A.P. testified that, when she was between the ages of five and seven, Purdy did put his fingers into her vagina more than once, did lick her vagina more than once, and had Trish lick her vagina more than once. (*Id.* at 66-67).

{¶23} On cross-examination, A.P. testified that in April (2012), she reported to a school official that her stepfather removed a blanket while she was sleeping and tried to touch her upper thigh. (*Id.* at 69). A.P. testified that she provided details about the alleged incident with her stepfather, including that he sat on a beanbag chair by her bed, the description of the sleeping pill he gave her, and what clothes she was wearing at the time. (*Id.* at 69-70). A.P. also testified that she told investigators that her stepfather tried to pull off the covers, and she pretended to be partially asleep and pull them back over herself, and he placed his hand on her right thigh towards her butt. (*Id.* at 71). A.P. testified that she admitted that she made the story up after she violated curfew and was arrested. (*Id.* at 72). A.P. testified that, after violating curfew, her mother initially grounded her for the entire summer. (*Id.* at 73). A.P. admitted that she told investigators that she believed that her stepfather had touched her before, and showed investigators a bruise on her inner thigh where she alleged her stepfather must

have touched her. (*Id.* at 74). A.P. testified that she told the story about her stepfather about three to four times to different people during the investigation. (*Id.* at 76). A.P. testified that she made the story up about her stepfather to get sympathy and avoid punishment for violating curfew. (*Id.* at 76-77). A.P. testified that she changed her mind about lying about her stepfather after hearing her mother crying a couple days after she made the allegations. (*Id.* at 77-78).

{¶24} A.P. also testified that she originally told law enforcement that Purdy made her touch his penis, until just recently when she stated that that did not happen. (*Id.* at 78-79). A.P. testified that her very first visit with Purdy on Vine Street occurred close to spring time, because it was warm and she recalled seeing flowers on the trees. (*Id.* at 79-80). A.P. testified that she learned about dildos and sex toys, as well as the saying "going down on you," from children at school, but the first time she saw sex toys was in Purdy's room. (*Id.* at 81-82). When questioned about how she knew her father had a sex toy, A.P. testified that it looked like a penis, and when asked how may penises she had seen before at the age of five, A.P. testified just Purdy's penis. (*Id.* at 82-83). A.P. testified that she was currently grounded for violating curfew again after she was caught riding in a vehicle with another fourteen-year-old. (*Id.* at 88). A.P. testified that she could not remember what Purdy said to Trish when Trish told him that what they were doing was wrong. (*Id.* at 90). A.P. testified that she could not remember

everything that happened at first but she had to think about it, including the incident with Trish. (*Id.* at 91).

{¶25} On re-direct, A.P. testified that some of the things she alleged about her stepfather were true, like the fact that he came into her bedroom, asked her about the radio, and gave her a sleeping pill. (*Id.* at 94). A.P. testified that Trish put her mouth on A.P.'s vagina more than once; Purdy placed his mouth on her vagina more than once; and Purdy placed his fingers into her vagina more than once. (*Id.* at 95-96). A.P. testified that she is not lying about Trish or Purdy, and Trish never asked her to lie about Purdy. (*Id.* at 96-97). On re-cross, A.P. admitted that she lied before about her stepfather to avoid getting into trouble for a curfew violation, and she violated curfew again. (*Id.* at 98-99).

{¶26} Trisha Steele, who A.P. called "Trish," testified that she was indicted on multiple counts of rape with specifications that the victim was under the age of ten. (*Id.* at 101-102). Steele testified that she agreed to plead guilty to one count of rape in exchange for her truthful testimony in the trial against Purdy. (*Id.* at 102-103). Steele testified that she has not yet been sentenced, and she faces a possible of three to ten years with no guaranteed sentence as part of the plea deal. (*Id.* at 104). Steele testified that she dated and lived with Purdy—first they lived on Vine Street, along with her son, Raven, Purdy's sister, her boyfriend, and Purdy's father. (*Id.* at 105-106). Steele testified that she later lived with Purdy on

Roberts, and she identified State's exhibit one as a photograph of the house. (*Id.* at 106-107). Steele testified that A.P. stayed in the home every other weekend, and A.P. was around five to six years old at that time, which was about the same age as Raven. (*Id.* at 107). Steele testified that A.P. loved her father, and A.P. was a "daddy's girl" and wanted to be everywhere with Purdy. (*Id.* at 108).

{¶27} Steele testified that she first noticed something odd when Purdy was tucking A.P. into bed and she walked in and noticed Purdy jump back from the bed very fast and A.P. was laying there not knowing what to say or do. (*Id.* at 109). Steele testified that eventually there was a time when A.P. was laying on the bed with her legs spread apart, and Purdy "went down on her, [a]nd then he had me go down on her." (*Id.* at 111). When asked to testify what "go down on her" meant, Steele testified "[h]is tongue touched her clit," and Purdy was licking A.P.'s clit. (*Id.*). Steele testified that Purdy "told me to go -- to lick her clit with my tongue," so she did. (*Id.*). Steele testified that when she did that, A.P. "grabbed me by my ears and pulled me down closer to her." (*Id.* at 112). Steele testified that Purdy was sitting right beside her at that time. (*Id.*). Steele testified that Purdy had her lick A.P.'s vagina another time, except this time Purdy, who was undressed from the waist down, had A.P., who was also undressed from the waist down, grind on his private area. (*Id.* at 113-114). Steele further testified that Purdy had her demonstrate to A.P. how to give a blowjob, so A.P. would

know how to do it. (*Id.* at 114). Steele testified that A.P. then placed her mouth on Purdy's penis as she had instructed her, and Steele was standing there when this happened. (*Id.*). Steele testified that she never saw Purdy do anything else sexually to A.P., and after the second incident occurred, she stopped because she was disgusted and ashamed of herself. (*Id.* at 115). Steele testified that she participated the first two times because she was stupid and scared of Purdy since he had a temper and had struck her before. (*Id.* at 115-116). She testified that, after the second time, she told Purdy that she was not going to continue this activity, because it was disgusting and nasty. (*Id.* at 116).

{¶28} Steele testified that she never told anyone what Purdy was doing to A.P. because she was afraid that she would get into trouble, too. (*Id.* at 117). Steele testified that she did not leave Purdy after the incidents occurred, but she did eventually leave Purdy after he was arrested on a different matter. (*Id.* at 118). Steele testified that she saw A.P. a couple years ago at Square Fair, and they talked about how she was doing in school, but they never discussed the previous sexual incidents. (*Id.* at 119). Steele testified that she spoke with investigator Najmulski about the sexual incidents, though she did not immediately tell Najmulski the truth. (*Id.* at 119-120). According to Steele, Najmulski came to her house and asked her to come down to the police station to discuss the sexual abuse case involving A.P., so she agreed to go with Najmulski. (*Id.* at 121). Steele testified

that she lied to Najmulski at first concerning her involvement with the abuse, though she later admitted what happened after Najmulski confronted her about her involvement. (*Id.* at 122-123). Steele testified that she is testifying as part of the plea deal in her case and "because it's the right thing to do." (*Id.* at 123).

{¶29} On cross-examination, Steele testified that, when she agreed to go to the police station, she knew that law enforcement was investigating both Purdy and her, but Steele was unaware of A.P.'s allegations against her stepfather. (*Id.* at 126). Steele admitted that she told law enforcement about Purdy's involvement, in part, to get a lighter sentence, but Steele denied that she was seeking any revenge toward Purdy. (*Id.* at 128). Steele testified that she wanted the truth to come out before the investigation, but she was scared since she also participated. (*Id.* at 129). Steele identified defendant's exhibit A as a copy of her plea agreement, and she testified that she was originally facing life sentences, but it was reduced to a possible maximum of ten years. (*Id.* at 129-131). Steele was unaware that A.P. never testified that she placed her mouth on Purdy's penis, but Steele attributed that to the fact that A.P. was young and afraid. (*Id.* at 132-134). Steele testified that, when she told Purdy that she was not engaging in the sexual conduct with A.P., the two had a twenty-minute argument yelling back and forth. (*Id.* at 135-136). Steele testified that A.P. spent several nights with them in the house on Vine Street prior to Christmas of 2003. (*Id.* at 138-139). She testified

that the sexual incidents occurred in the house on Roberts Street near the end of summer into fall. (*Id.* at 139). Steele could not remember exactly when they moved from Vine Street to Roberts Street, except that it was cold outside. (*Id.* at 141). When asked if she left Purdy in October 2005, Steele testified, "[i]f that's when he went to jail, yeah. Because that's when we separated. That's when I left." (*Id.* at 142). Steele testified that, when the sexual incidents occurred, her son and A.P. were less than ten years of age. (*Id.* at 143). Steele testified that her son was not involved in any of the sexual incidents. (*Id.* at 144).

{¶30} Wendy Daugherty testified that she was Purdy's supervising officer employed with the Ohio Adult Parole Authority ("APA"), and Purdy was under supervision beginning on July 3, 2003, though she was not assigned Purdy until August 2004. (*Id.* at 146-147). Daugherty testified that, when Purdy came under her supervision, Purdy was living at 119 East Vine Street, Lima, Allen County, Ohio. (*Id.* at 149). Daugherty testified that, prior to coming under APA's supervision, Purdy would not have been able to regularly visit A.P. without supervision. (*Id.*). Daugherty testified that Purdy informed her that he moved to 512 South Roberts Street, Lima, Allen County, Ohio on January 28, 2005. (*Id.* at 150). Daugherty testified that Purdy left this residence on October 19, 2005 after she had received an allegation concerning Purdy and A.P. on an unrelated incident. (*Id.* at 151, 154). Daugherty testified that Purdy was given an

administrative sanction as a result of his subsequent arrest, and, after serving this time, Purdy reported on July 15, 2006 that he was living at 119 East Vine Street, Lima, Ohio. (*Id.* at 152-153). Daugherty testified that Purdy was released from supervision in March 2007 and was not to have unsupervised contact with A.P. from July 2006 until March 2007. (*Id.* at 155). Daugherty testified that, when she searched Purdy's house on Roberts on October 19, 2005, she found a large box of pornographic magazines and sex toys, including dildos and vibrators. (*Id.* at 159, 162). Daugherty testified that the pornographic materials did not include children. (*Id.* at 162). When asked about where the children were residing in the home, Daugherty testified that she thought there was a small attic area where they might be staying, but she could not say for sure. (*Id.* at 163).

{¶31} Tiffany Najmulski testified that she is currently working for The Bureau of Criminal Investigation, but she was previously assigned to juvenile investigations for the Lima Police Department. (*Id.* at 166-167). Najmulski testified that, during her investigation into A.P.'s report concerning her stepfather, she or children's services asked A.P. whether anyone else had touched her inappropriately, and A.P. indicated Trisha and Purdy. (*Id.* at 172-173). Najmulski testified that A.P. did recant the story about her stepfather abusing her, which is why Najmulski investigated the allegations about Purdy and Trisha further. (*Id.* at 175-176). After Najmulski was able to locate Trisha through children's services,

she went to her home and informed Trisha that she was investigating possible sexual abuse between Purdy and A.P. (*Id.* at 174, 177). Najmulski testified that Trisha agreed to a voluntary interview at the police station. (*Id.* at 177-178). Najmulski testified that she told Trisha that she knew Purdy was sexually abusing A.P., and Trisha confirmed that it was true. (*Id.* at 179). After Najmulski told Trisha she knew Trisha was also involved, Trisha admitted she was involved and provided Najmulski details of the sex offenses. (*Id.* at 179-180). Najmulski testified that, during her interviews, she never gave Trisha any details A.P. provided, nor did she give A.P. any details Trisha provided. (*Id.* at 181-182). Trisha indicated that Purdy told her to show A.P. how to give him oral sex by demonstrating it in A.P.'s presence. (*Id.* at 184). Najmulski also testified that Trisha told her that Purdy performed oral sex on A.P., and Purdy made her perform oral sex on A.P., as well. (*Id.*). Najmulski testified that Trisha indicated that she performed oral sex on A.P. at Purdy's instruction because she feared Purdy, and Purdy was abusive in the past. (*Id.* at 185). Najmulski further testified that Trisha indicated that, when she was performing oral sex on A.P., A.P. placed her hands in her hair like she was enjoying it. (*Id.* at 186).

{¶32} On cross-examination, Najmulski testified that no physical evidence was discovered to substantiate A.P. or Trisha's claims. (*Id.* at 186-187). With regard to the timeframe of the sexual abuse, Najmulski testified that A.P. believed

it occurred in the springtime, and Purdy's probation officer stated that Purdy lived on Roberts from January 2005 to October 2005. (*Id.* at 189-190). Najmulski agreed that A.P. lied about her stepfather, and the only evidence that exists concerning Purdy's sexual abuse of A.P. is the statements of A.P. and Trisha. (*Id.* at 190-191). On re-direct, Najmulski testified that it was not uncommon for victims to forget specific dates when the crimes happened several years prior, and A.P. remembered that one of multiple incidents occurred in the spring. (*Id.* at 191).

{¶33} Thereafter, the State rested, and the defense made a Crim.R. 29(A) motion, which the trial court denied.[3] (*Id.* at 192-196). The defense then rested, and the trial court found Purdy guilty on all six counts. (*Id.* at 197, 227-230).

{¶34} Purdy was convicted of six counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides, in pertinent part: "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." "Sexual conduct" includes: "cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal * * * opening of another." R.C. 2907.01(A).

---

[3] Crim.R. 29(A) does not apply to bench trials; the fact that defense counsel made a Crim.R. 29(A) motion and the trial court denied the same does not affect our analysis or the outcome herein. *Dayton v. Rogers*, 60 Ohio St.2d 162, 163 (1979), overruled on different grounds by *State v. Lazzaro*, 76 Ohio St.3d 261 (1996).

{¶35} Two of the six counts of rape involved Purdy's complicity when he instructed Trisha to perform oral sex on A.P. Ohio's complicity statute provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [s]olicit or procure another to commit the offense." R.C. 2923.03(A)(1). The rape of a victim under the age of thirteen is a strict liability offense under R.C. 2907.02(A)(1)(b). *State v. Wilson*, 3d Dist. Allen No. 1-08-60, 2009-Ohio-1735, ¶ 21, citing *State v. Nicodemus*, 10th Dist. Franklin No. 96APA10-1359 (May 15, 1997), *State v. Moore*, 8th Dist. Cuyahoga No. 83692, 2004-Ohio-5732, ¶ 16.

{¶36} Purdy argues that his convictions are against the manifest weight of the evidence because the victim and his co-defendant were not credible. We must disagree. To begin, credibility and weight of the evidence is primarily the role of the trier-of-fact—in this case, the trial court. *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 106, citing *DeHass* at paragraph one of the syllabus. After weighing the evidence and evaluating the credibility of these witnesses, with appropriate deference to the trial court's credibility determination, we cannot conclude that the trial court, as the trier of fact, clearly lost its way and created a manifest injustice here.

{¶37} Although A.P. admittedly made false allegations that her stepfather sexually abused her, A.P. confessed to making these false allegations a few days

later and had an immediate motive to create the false allegations; to wit: to obtain sympathy and escape punishment for violating curfew. A.P.'s mother indicated that she was going to ground A.P. for the entire summer for her misbehavior, though she later modified that punishment to two weeks. It is noteworthy that A.P. testified that she did not fabricate the entire story about her stepfather, saying that parts of her story were truthful. A.P. had no immediate motive to make false allegations against Purdy; in fact, A.P. had a very close bond with Purdy when she was younger and had recently reconnected with Purdy through Facebook, which indicates that she did not harbor ill will towards Purdy for these past events. A.P. even left home without her mother's knowledge to see Purdy and reestablish a bond with him. That A.P. could not recall the specific dates when the sexual conduct occurred or that A.P. was confused about certain details, i.e. first telling investigators that Purdy forced her to touch his penis and later admitting she voluntarily touched Purdy's penis, does not affect her credibility in light of the fact that these crimes occurred more than seven years prior to the trial, and when A.P. was only five years old.

{¶38} With respect to Trisha's credibility, Trisha testified that she did not come forward prior to A.P. making the allegations against her and Purdy, because she was afraid of the consequences from Purdy, who was previously physically abusive, and the criminal consequences for her involvement. The trial court

specifically found Trisha was scared and tried to forget the past abuse, but now she was trying to come clean and was, therefore, credible. (Oct. 22, 2012 Tr. at 227). While it is true that Trisha received a reduced sentence for her truthful testimony against Purdy, Trisha still faced a potential of ten years for her involvement, which is a significant sentence in light of the fact that Trisha has a minor child. There was also no indication that Trisha had any hatred or ill will toward Purdy; rather, the record indicated that Trisha tried to forget her involvement in the sexual abuse. Trisha only admitted her involvement after investigator Najmulski told her that she knew Trisha was involved.

{¶39} Trisha's testimony confirmed certain critical details of A.P.'s testimony—critical details that investigators kept from the two witnesses during the interview process. Trisha confirmed that the sexual abuse occurred in Purdy's bedroom. Trisha confirmed that A.P. placed her hand on Trisha's head (near her ears) while Trisha was performing oral sex on A.P. Trisha also confirmed that she had a heated, verbal confrontation with Purdy concerning her continued participation in the sexual abuse, which was consistent with A.P.'s testimony that she overhead Trisha tell Purdy she did not want to continue the sexual abuse. A search of Purdy's home also revealed multiple sex toys in the home, which was consistent with A.P.'s testimony that she saw these items in Purdy's bedroom.

{¶40} The testimony of Purdy's probation officer, an independent witness, confirmed the dates when Purdy was living at the two different addresses, which coincided with the dates A.P. and Trisha provided for the sexual abuse incidents.

{¶41} Based upon the foregoing, we are not persuaded that the trial court, by convicting Purdy of rape, clearly lost its way creating a manifest injustice.

{¶42} In a total of one paragraph, Purdy argues that his conviction was not supported by sufficient evidence because A.P. and Trisha were not credible witnesses. However, in concluding that Purdy's conviction was not against the manifest weight of the evidence above, we concluded that the record supports the trial court's determination that A.P and Trisha were credible witnesses. Their testimony provides evidence of all the elements of the offenses. Therefore, we must reject Purdy's sufficiency argument.

{¶43} Purdy's first and second assignments of error are, therefore, overruled.

{¶44} Although Purdy's assignments of error lack merit, we must remand this matter for an R.C. 2929.191 hearing for the trial court to properly impose the mandatory five years of PRC pursuant to R.C. 2967.28(B)(1). At sentencing, the trial court stated:

[t]he Court would further note that these are felonies of the first

degree but there is a life imprisonment so this would not – P.R.C.

> eligibility after he was released but he – it's still under parole so that we do not advise the defendant of his eligibility under post release control. (Nov. 14, 2012 Tr. at 14).

Since Purdy was convicted of a felony sex offense, R.C. 2967.28(B)(1) requires the trial court to impose a mandatory, five-year term of PRC, regardless of the fact that a life sentence is imposed. *State ex rel. Carnail v. McCormick*, 126 Ohio St.3d 124, 2010-Ohio-2671, ¶ 20, 31; *State v. Miller*, 1st Dist. Hamilton, No. C-120109, 2012-Ohio-5964, ¶ 28; *State v. Roseberry*, 7th Dist. Belmont No. 11 BE 21, 2012-Ohio-4115, ¶ 14-16; *State v. Cottrell*, 8th Dist. Cuyahoga No. 97629, 2012-Ohio-2634, ¶ 8-10; *State v. Morris*, 11th Dist. Portage No. 2010-P-0048, 2011-Ohio-1453, ¶ 29-30; *State v. Miller*, 12th Dist. Clermont No. CA2011-04-028, 2012-Ohio-995, ¶ 36. Therefore, we remand this matter for an R.C. 2929.191 hearing so the trial court can properly advise Purdy of his mandatory, five-year PRC obligation and further incorporate that notification into its judgment entry of sentence.

{¶45} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of conviction. Nevertheless, since the trial court failed to properly impose the mandatory, five-year term of PRC under R.C. 2967.28(B)(1), we vacate the sentence, in part, and remand for an R.C. 2929.191 hearing and new judgment entry of sentence.

*Judgment Affirmed and
Sentence Vacated in Part*

**SHAW, J., concurs.**

**/jlr**

**ROGERS, J. concurring separately.**

{¶46} I concur with the result reached by the majority in this case. However, I write separately because I disagree with the order in which the majority addresses the issues of manifest weight and sufficiency of the evidence. I also believe the majority has improperly applied a test of credibility to the issue of sufficiency of the evidence.

{¶47} It is my opinion that, when an appellant raises both the issue of sufficiency of the evidence and manifest weight of the evidence, a reviewing court should analyze assignments of error in that respective order. Initially, I emphasize that, logically, a reviewing court will never reach the issues of weight of the evidence or credibility of witnesses without first finding that evidence was presented on each element of the offense which, if believed, would support a conviction. Further, I believe this is the logical order of analysis for the following reasons.

{¶48} First, this sequence of analysis follows the order of the stages in a criminal trial. At the close of the State's presentation of evidence in a jury trial,

and again at the close of all evidence, a defendant may move for acquittal pursuant to Crim.R. 29. "An appellate court reviews a denial of a Crim.R. 29 motion for acquittal using the same standard that an appellate court uses to review a sufficiency-of-the-evidence claim." *State v. Ali*, 154 Ohio App.3d 493, 2003-Ohio-5150, ¶ 21 (7th Dist.), citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995). "Whether the state presented sufficient evidence is a question of law dealing with adequacy." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Only after the trial court overrules the Crim.R. 29 motion and finds that sufficient evidence exists will the issue go to the trier of fact for determination of the credibility of the witnesses and weight of the evidence.[4]

{¶49} Next, the Supreme Court of Ohio has repeatedly distinguished sufficiency and manifest weight arguments, holding that "[a] claim that a jury verdict is against the manifest weight of the evidence involves a separate and distinct test that is much broader [than the test for sufficiency]." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, ¶ 193. Logically, judicial economy requires that this Court first conduct the narrower analysis, as this may dispose of the entire case, rather than undertaking the broader analysis first.

---

[4] Of course, I am also of the opinion that the trial court always has a responsibility to make a determination of sufficiency of the evidence before permitting a case to go to the jury, whether or not a formal motion has been made by the defense. This is because a conviction that is unsupported by sufficient evidence constitutes a denial of due process. *Thompkins* at 386.

{¶50} Also, double jeopardy will bar retrial where reversal of a conviction is based upon a reviewing court's finding that the evidence was legally insufficient. *Tibbs v. Florida* , 457 U.S. 31, 102 S.Ct. 2211 (1982); *Thompkins*, *supra*. However, double jeopardy does not preclude retrial where reversal is based upon the reviewing court's finding that the conviction was against the manifest weight of the evidence. *Thompkins* at 387. I would find that these double jeopardy ramifications also demonstrate that this Court should first consider sufficiency of the evidence.

{¶51} Finally, under the Ohio Constitution, a reviewing court's decision to reverse a conviction as being against the manifest weight of the evidence must be unanimous by the three judges hearing the cause. Section 3(B)(3), Article IV, Ohio Constitution. However, there is no such requirement for a reviewing court to reverse a conviction as being unsupported by sufficient evidence. I would find that the enhanced requirements for a reviewing court to reverse based on manifest weight to be another reason why this Court should consider sufficiency of the evidence first, prior to considering the broader issue of manifest weight.

{¶52} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio

St.3d 259 (1991), paragraph two of the syllabus, *superseded on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89 (1997). Notably, this standard does not require a test of credibility to be applied by the court, but only requires that the court determine that some evidence was presented as to each element of the offense. This is the only test the State must satisfy as to sufficiency. The language "if believed" does not require the court to believe the evidence presented.

{¶53} The test of credibility is applied by the trier-of-fact when deciding which testimony to believe and/or not believe. This is the test for the manifest weight of the evidence. Based on the differences between sufficiency and manifest weight analyses, the Supreme Court has handed down the following comparison of the two standards:

> The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different.
> With respect to sufficiency of the evidence, " 'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Black's Law Dictionary* 1433 (6th Ed.1990). *See also* Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson*, 162 Ohio St. 486 (1955). In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs*, 457 U.S. at 45, 102 S.Ct. 2211, citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979).

> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *Robinson* at 487. Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) *Black's*, *supra*, at 1594.

*Thompkins*, 78 Ohio St.3d 380, 386-387.

{¶54} It seems clear to me then, that the issue of credibility only arises when considering manifest weight, and plays no role in a determination of sufficiency. Yet the majority has turned this process on its head by stating that because the testimony has been determined to be credible, it then follows that the evidence was sufficient. *Ante* at ¶ 42.

{¶55} Consequently, I disagree with the analysis by which the majority reached its conclusion, and the standard applied, however, I nevertheless concur with the result.

/jlr